ALLEN LEAVELL, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 29996–91.          Filed January 30, 1995.

*Bennett G. Fisher* and *Ian Cain,* for petitioner.
*Victoria Sherlock* and *Susan Sample,* for respondent.

RUWE, *Judge:*\* This case is before the Court pursuant to a petition filed by Allen Leavell for redetermination of respondent's determination of a deficiency of $66,897 in petitioner's 1985 Federal income tax. Unless otherwise

---

\* This case was reassigned to Judge Robert P. Ruwe by order of the Chief Judge.

indicated, section references are to the Internal Revenue Code in effect for 1985, the taxable year in issue. Rule references are to the Tax Court Rules of Practice and Procedure.

After concessions by the parties, the sole issue for decision is whether $204,333.35 paid to petitioner's wholly owned personal service corporation, Allen Leavell, Inc. (corporation), is includable in his gross income. The Houston Rockets (Rockets), a basketball team in the National Basketball Association (NBA or association), paid this amount to corporation in exchange for petitioner's services as a professional basketball player.

### FINDINGS OF FACT

Many of the facts have been stipulated and are so found. The stipulation of facts, first supplemental stipulation of facts, and attached exhibits are incorporated herein by this reference. For the taxable year in issue, petitioner filed a 1985 Form 1040, U.S. Individual Income Tax Return, with the Austin Service Center of the Internal Revenue Service. When he filed his petition in this Court, petitioner resided in Houston, Texas.

Petitioner began playing professional basketball for the Rockets in 1979. On July 1, 1980, upon advice of counsel, petitioner formed corporation to serve as his representative/employer for his services as a professional basketball player and to market his personal appearances and endorsement opportunities.[1] Corporation observed all corporate formalities as required by the laws of Texas, its State of incorporation, and was in good standing throughout the taxable year in issue. Corporation had a fiscal year that ended on June 30.

Petitioner was the sole shareholder of corporation during its existence and served as corporation's president and treasurer; petitioner also served as one of corporation's two directors. Petitioner's attorney and agent, Lance Luchnick, served as corporation's vice president and secretary; Mr. Luchnick also served as corporation's other director. Mr. Luchnick was actively involved in the day-to-day operation of corporation; his duties and responsibilities included opening corporation's

---

[1] In addition to their salary from playing basketball, well-known players in the NBA can earn money through endorsements.

mail and paying its bills, maintaining and controlling its checking account, depositing and writing its checks, paying its payroll, preparing (or causing to be prepared) its tax returns, and negotiating all contracts on its behalf. Petitioner met routinely with Mr. Luchnick to review the business of corporation.

In his individual capacity, petitioner entered into an employment agreement with corporation under which petitioner agreed to provide his basketball and promotional services exclusively for corporation. This agreement gave corporation the right to determine the professional basketball team for which petitioner would perform and also the right and authority to contract with any professional basketball team.[2] With respect to his promotional services, corporation generated income opportunities for petitioner based on his endorsements of consumer products (e.g., Nike shoes, athletic equipment, and clothing) and by promoting petitioner's appearances at selected events. For each of these income opportunities, corporation had the right to dictate to petitioner the time and place of the endorsement or the event.

On December 11, 1984, the Rockets and corporation executed a contract entitled "Uniform Player Contract". The Uniform Player Contract was a form contract drafted by the NBA; the individual teams in the NBA were required to use the Uniform Player Contract to bind a player to their team, and could not omit or reject any of the provisions therein. The 1984 Uniform Player Contract executed by corporation and the Rockets was for a term of 2 years starting on September 1, 1984, and covered the Rockets' 1984–85 and 1985–86 basketball seasons.[3]

The 1984 Uniform Player Contract designated Allen Frazier Leavell, Inc., as the "player". There is nothing in the written terms of the 1984 Uniform Player Contract that specifically calls for petitioner to personally perform the serv-

[2] Respondent argues that petitioner has failed to prove that an agreement between petitioner and corporation actually existed. Petitioner testified that such an agreement existed but admitted that it was never put into writing. There was no evidence regarding the date of the agreement or whether it was for a specific period of time or terminable at the will of either party. There was also no evidence regarding the method or means by which such nonwritten agreement was entered into. The trial judge, based upon the evidence, concluded that there was an agreement between petitioner and corporation, and we will follow his finding that the agreement existed.

[3] Basketball seasons for teams in the NBA begin in one calendar year and end in the following calendar year.

ices required to be provided by the "player".[4] The contract required that the "player": Attend each training camp; play the scheduled games during each season; play all scheduled exhibition games during and prior to the season; when invited, play in the All-Star Games and attend every event associated with the All-Star Games; play in the playoff games subsequent to each regular season; report at the time and place fixed by the Rockets in good physical condition; keep in good physical condition throughout each season; give his best services and loyalty to the Rockets; agree to give immediate notice of any injury suffered by him, including the time, place, cause, and nature of such injury, and submit himself to a medical examination and treatment by a physician designated by the Rockets; play only for the Rockets or its assignees; report to the club to whom his contract has been assigned within 48 hours after receiving notice of the assignment or within such longer time for reporting as may be specified in the notice; and refrain from, directly or indirectly, enticing any player or coach to enter into negotiations for or relating to his services as a basketball player.

The contract also required that the "player": Observe and comply, at all times whether on or off the playing floor, with all requirements of the Rockets respecting conduct of its team and its players; be neatly and fully attired in public and always conduct himself according to the highest standards of honesty, morality, fair play, and sportsmanship, on and off the court; not do anything which is detrimental to the best interests of the Rockets or the association; not engage in sports endangering his health or safety (including, but not limited to, professional boxing or wrestling, motorcycling, moped riding, auto racing, sky diving, and hang gliding); except with written consent of the Rockets, not engage in any game or exhibition of basketball, football, baseball, hockey, lacrosse, or other athletic sport; allow the Rockets or the association to take pictures of the "player", alone or together with others, at such times as the Rockets or association may designate; refrain from public appearances, participating in radio or television programs, permitting his picture to be taken or writing or sponsoring newspaper or magazine articles or commercial products without the written consent of

---

[4] The entire Dec. 11, 1984, Uniform Player Contract is attached as the appendix.

the Rockets, which shall not be withheld except in the reasonable interests of the Rockets or professional basketball; make himself available for interviews by representatives of the media conducted at reasonable times; agree to participate in all other reasonable promotional activities of the Rockets and the association; and conform his personal conduct to standards of good citizenship, good moral character, and good sportsmanship.

Under the contract, the Rockets could impose fines, sanctions, and other disciplinary measures for "player" violations. For example, the "player" could be: Fined, suspended, and have his compensation reduced for violating the requirements of the Rockets respecting conduct of its team and players; suspended and have his compensation reduced for not arriving in good physical condition for the first game of the season, or if he fails to remain in good physical condition throughout the season (unless the condition results from any injury sustained as a direct result of participating in any practice or game played for the Rockets); suspended and have his compensation reduced for failing to report to a club to whom his contract has been assigned; and fined and suspended for engaging in sports that may endanger his health or safety.

The contract also provides that the association could impose fines, sanctions, and other disciplinary measures. For example, the "player" could be: Suspended or indefinitely expelled by the commissioner if he bet, or offered or attempted to bet, money on the outcome of any game participated in by any club which is a member of the association; subject to a fine not exceeding $1,000 by the association for giving, authorizing, or endorsing any statement having or designed to have, an effect that is prejudicial or detrimental to the best interests of basketball or of the association; subject to a fine not exceeding $10,000 and suspended by the association for engaging in an act or conduct during a preseason, championship, playoff, or exhibition game that is prejudicial to or against the best interests of the association or the game of basketball; and subject to a fine not exceeding $1,000 and be suspended for a definite or indefinite period for engaging in conduct that, in the opinion of the commissioner, is prejudicial or detrimental to the association.

The 1984 Uniform Player Contract was negotiated primarily by Mr. Luchnick on behalf of corporation and by Ray Patterson on behalf of the Rockets. Petitioner signed the contract for corporation in his capacity as its officer,[5] and Mr. Patterson signed the contract for the Rockets in his capacity as the Rockets' president and general manager. Mr. Patterson signed the 1984 Uniform Player Contract with the understanding that it was not a contract with petitioner, but rather, was a contract between the Rockets and corporation in order to acquire petitioner's services. The Rockets wanted to obtain petitioner's services and did not care if his services were obtained through corporation. However, as a condition to entering into the 1984 Uniform Player Contract, the Rockets required petitioner, in his individual capacity, to enter into a written agreement with the Rockets entitled "Personal Guarantee by Player". This "Personal Guarantee", which was also signed on December 11, 1984, provided as follows:

PERSONAL GUARANTEE BY PLAYER

(For Use When Player Contract Is Entered
Into By Player Corporation)

I, /s/ Allen Leavell, in order to induce _____
(hereinafter called the "Club") to enter into the annexed Player Contract with ALLEN LEAVELL, INC. (hereinafter called the "Company"), and intending the Club to rely hereon, do hereby make the following representations, warranties, and agreements:

1. I have read the annexed Player Contract (and any amendments, riders, and addenda thereto), and understand that it calls for the Company to provide my services as a professional basketball player. In consideration of the promises, conditions, and provisions contained in said Player Contract, I hereby expressly accept and agree to be bound by all the terms and conditions thereof.

2. The Company has the right to enter into the annexed Player Contract, to grant all the rights therein granted, and to supply my services to the Club pursuant to the terms thereof. I will cause the Company to perform all of its obligations pursuant to the terms of the annexed Player Contract.

3. I will perform and supply all of the services which the Company has agreed to perform and supply to the Club pursuant to the terms of the annexed Player Contract.

---

[5] Petitioner's signature on the 1984 Uniform Player Contract appears immediately above the designation "Allen Leavell Player" and his home address. While petitioner's signature does not explicitly indicate that he was signing in the capacity of a corporate representative or agent, petitioner testified that he intended to sign in his capacity as a corporate officer. The trial judge accepted petitioner's testimony on this point, and we will follow his finding.

IN WITNESS WHEREOF, I have executed this personal guarantee this 11 day of DECEMBER, 1984.

/s/ Allen Leavell

WITNESS:
/s/ Ray A. Patterson

As a member in the NBA, the Rockets played games at the times and places scheduled by the NBA. The Rockets had the right to require petitioner to provide his services at the times and places of scheduled games. The facilities in which games were played were provided by the respective team organizations. The Rockets provided the arena in which its home games were played. The Rockets, through its coach, scheduled the time and place where petitioner was required to attend training camp and practice sessions and provided for the facilities in which they were conducted. The coach determined the type of drills that would be performed by players during training camp and practice sessions.

NBA teams like the Rockets generally have 12 players on their active team roster. During a game, only five players from each team are actually playing at any one time. Coaches regularly substitute players during games. The primary object of the team having possession of the ball is to score. This generally requires the five individual players on the basketball court to coordinate their actions. The primary object of the team that does not have possession of the ball is to prevent the offensive team from scoring and to gain possession of the ball. This also generally requires the individual players to coordinate their defensive actions.

The coach of the Rockets determined the general game strategy that was to be utilized by the players during games. The coach also had the authority to direct players as to game tactics and the use of specific plays. Because of the fast pace of the game, the players were expected to exercise discretion to adjust their play to meet the immediate circumstances, even if this sometimes required deviation from the coach's directives. The coach had the authority to determine who would play in a game, how much time a player would play, and who would be cut from the team. This authority provided the coach with leverage over players in order to induce them to conform to his directions and expectations.

During the year in issue, petitioner's regular position on the Rocket's basketball team was "point guard". That position required petitioner to take a leadership role during games. The point guard would generally bring the ball up the court and generally provide direction to other team members.

When the Rockets paid corporation the compensation required by the 1984 Uniform Player Contract, the Rockets did not withhold income taxes or pay or withhold payroll taxes. For the 1985 calendar year, the Rockets issued corporation a 1985 Form 1099–MISC, Miscellaneous Income, reporting that the Rockets paid corporation $204,333.35 in nonemployee compensation during that calendar year. For its fiscal year ended June 30, 1985, corporation filed a Form 1120, U.S. Corporation Income Tax Return, and reported in its gross income all amounts that the Rockets paid corporation during that fiscal year pursuant to the 1984 Uniform Player Contract. Corporation also included in its gross income all compensation that it received during that fiscal year for petitioner's endorsement and promotional services. Corporation's Form 1120 further reported that corporation paid petitioner $135,600 during corporation's fiscal year ended June 30, 1985. Corporation withheld both Federal income taxes and Social Security taxes from this amount.

For its fiscal year ended June 30, 1986, corporation filed a Form 1120 and reported in its gross income all amounts that the Rockets paid corporation during that fiscal year pursuant to the 1984 Uniform Player Contract. Corporation's Form 1120 also reported that corporation paid petitioner $100,400 during corporation's fiscal year ended June 30, 1986, and that corporation contributed $27,663 to a pension plan.

Corporation issued petitioner a 1985 Form W–2, Wage and Tax Statement, reporting that corporation paid petitioner wages of $111,400 during the 1985 calendar year and that, with respect to these wages, corporation withheld: (1) Federal income taxes of $10,560.37, and (2) Social Security taxes of $2,791.80. On petitioner's 1985 Form 1040, he included the wages on line 7, wages, salaries, tips, etc., and included the withheld Federal income taxes on line 57, Federal income taxes withheld.

Corporation did not pay any expenses incurred for petitioner's travel as a member of the Rockets. These travel expenses were paid directly by the Rockets.

Respondent determined that the entire amount paid by the Rockets to corporation during the 1985 calendar year should be included in the income of petitioner and, accordingly, increased petitioner's income by $92,933 (the difference between (1) the $204,333 that the Rockets paid corporation during the 1985 calendar year, and (2) the $111,400 that petitioner included in his 1985 gross income as paid to him by corporation during that calendar year). Respondent did not determine any reassignment of income received by corporation for services performed by petitioner other than with respect to the payments from the Rockets. Respondent does not contest the fact that corporation was a separate, legal entity for some purposes; respondent argues that corporation should be disregarded for purposes of the compensation paid to it by the Rockets.

## OPINION

The issue before us is whether compensation paid by the Houston Rockets in return for the performance of personal services by petitioner is income to him or to his personal service corporation.[6] Whether a personal service corporation should be recognized as the recipient of income for tax purposes has been the subject of numerous cases. We recently had occasion to analyze this issue in the context of professional athletes. See *Sargent v. Commissioner,* 93 T.C. 572 (1989), revd. 929 F.2d 1252 (8th Cir. 1991).

The facts in *Sargent* are analogous to those presented here. The taxpayers in *Sargent* were professional hockey players who formed personal service corporations and entered into contracts to furnish their services to their personal service corporations. The personal service corporations, in turn, contracted with the professional hockey club (the club) to furnish the services of the individual taxpayers to the club. The individual taxpayers also guaranteed that they would perform these services for the club.

In *Sargent v. Commissioner, supra,* we applied the assignment of income doctrine articulated in *Lucas v. Earl,* 281

---

[6] Respondent has not argued and has disavowed reliance on sec. 269A.

U.S. 111, 114–115 (1930), in which the Supreme Court held that the predecessor to section 61 taxed salaries, fees, and compensation "to those who earned them", "that the tax could not be escaped by anticipatory arrangements and contracts however skilfully devised to prevent the salary when paid from vesting even for a second in the man who earned it", and that "no distinction can be taken according to the motives leading to the arrangement by which the fruits are attributed to a different tree from that on which they grew." This was reaffirmed in *United States v. Basye,* 410 U.S. 441, 450 (1973):

The principle of *Lucas v. Earl,* that he who earns income may not avoid taxation through anticipatory arrangements no matter how clever or subtle, has been repeatedly invoked by this Court and stands today as a cornerstone of our graduated income tax system. * * *

See also *Commissioner v. Culbertson,* 337 U.S. 733, 739–740 (1949) ("the first principle of income taxation * * * [is] that income must be taxed to him who earns it").

In deciding whether the compensation paid by the club was income of the individual hockey players, as opposed to income of their personal service corporations, we used the test for determining whether the individual players were "employees" of the club, as opposed to being employees of their personal service corporations. The criteria for making this determination are comparable to those used to determine whether an individual is an employee or an independent contractor. *Sargent v. Commissioner,* 93 T.C. at 578.[7] In the employee versus independent contractor analysis, the issue turns on whether the service recipient has the right to control the manner and means by which the services are performed.[8] *Weber v. Commissioner,* 103 T.C. 378, 387 (1994). If the answer is yes, the service provider is an employee. If the

---

[7] As we have previously stated:

While the cases which deal with the common law factors usually involve a determination of whether a person is an employee or an independent contractor, the principles are equally applicable to determine by whom an individual is employed. [*Professional & Executive Leasing, Inc. v. Commissioner,* 89 T.C. 225, 232 (1987), affd. 862 F.2d 751 (9th Cir. 1988); fn. ref. and citation omitted.]

[8] Throughout this opinion, we describe the test as the right to control the "manner and means" by which the services are performed. This test is also often described as control over the "method and means", "details and means", and various other formulations. See *Weber v. Commissioner,* 103 T.C. 378, 388–389 (1994); *Professional & Executive Leasing, Inc. v. Commissioner,* 89 T.C. at 231–232; sec. 31.3121(d)–1(c)(2), Employment Tax Regs.

answer is no, the service provider is an independent contractor. As an independent contractor, the individual service provider retains control over his activities. This control generally includes the right to grant an intermediate entity the right to control his services. Thus, individual persons who are independent contractors generally retain the right to choose to do business as a corporation. This same flexibility, however, does not exist where there is an employer-employee relationship between the individual service provider and the service recipient.[9] If the service provider's relationship with the service recipient gives the recipient the actual right to control the manner and means by which services are provided, the service provider cannot, with respect to those same services, simultaneously be an employee of his personal service corporation. Put simply, the individual service provider who is an employee of the recipient of his services cannot transfer control over his activities to his personal service corporation, because he cannot transfer something which he does not have.

*Sargent* was the first case involving a personal service corporation in which we applied the assignment of income doctrine by reference to the common law test for determining whether an employer-employee relationship existed between the service recipient and the individual service provider. The primary consideration for determining whether an individual is an employee of one organization or another is which of the two has the right to control the activities of the individual person whose status is in issue. *Sargent v. Commissioner,* 93 T.C. at 578. Whenever this issue arises in a setting involving a personal service corporation, there are three parties: The individual service provider, the recipient of the service, and the personal service corporation that has been formed as a legal entity through which the individual seeks to offer his services. In this context, it is critical to examine the reality of the relationship between the individual service provider and the recipient of those services.

In *Sargent*, we found that the taxpayers were employees of the club because the activities of the hockey players in question were subject to the control of the club. We, therefore,

---

[9] Whether an individual taxpayer is classified as an independent contractor or as an employee has important income and employment tax consequences, many of which would be nullified if employees were able to alter their tax status simply by forming a personal service corporation.

held that the compensation paid by the club was earned by the taxpayers as individual employees of the club and taxable to them individually. In *Sargent,* we distinguished previously decided cases that involved the issue of whether compensation paid by the recipient of personal services was income to the individual workers or their personal service corporations, because the issue of whether the service provider was an employee of the service recipient had not been examined. As a result, we found those previous cases inapplicable to our analysis. *Sargent v. Commissioner,* 93 T.C. at 580–583.[10]

Because our decision in *Sargent* was reversed by the Court of Appeals for the Eighth Circuit, we will reconsider the legal principles upon which we relied in *Sargent.* We will begin our analysis by identifying the issues upon which we and the Court of Appeals agree.

First, the Court of Appeals accepted our use of the employer-employee analysis as the proper focus for determining whether or not to apply the assignment of income doctrine. *Sargent v. Commissioner,* 929 F.2d at 1254. Second, the Court of Appeals accepted the principle that the most important single factor for determining the identity of the employer is answered by identifying who has the right to control the manner and means by which the individual's services are performed. *Id.* at 1256. In this respect, the Court of Appeals held that in order for a personal service corporation to be recognized as the employer: (1) It must have "the right to direct and control" the activities of the individual service provider "in some meaningful sense", and (2) "there must exist between the corporation and the person or entity (club) using the services a contract or similar indicium rec-

---

[10] In both *Haag v. Commissioner,* 88 T.C. 604 (1987), affd. without published opinion 855 F.2d 855 (8th Cir. 1988), and *Keller v. Commissioner,* 77 T.C. 1014 (1981), affd. 723 F.2d 58 (10th Cir. 1983), the individual taxpayers, prior to the formation of their personal service corporations, were partners in medical partnerships. As partners, the manner and means by which the services were performed were not controlled by the patients or clients of the taxpayers. Similarly, in *Pacella v. Commissioner,* 78 T.C. 604 (1982), the taxpayer was a medical professional who provided services to patients who had no right to control the manner and means by which the services were performed. In *Johnson v. Commissioner,* 78 T.C. 882 (1982), affd. without published opinion 734 F.2d 20 (9th Cir. 1984), there was no contractual relationship between the personal service corporation and the team. Therefore, it was not necessary that we address the issue of whether the team or the personal service corporation had the right to control the manner and means by which the taxpayer provided his basketball services to the team. See *infra* note 11.

ognizing the corporation's controlling position."[11] *Id.* at 1256. In this respect, we also agree with the Court of Appeals.

The Court of Appeals' reversal was based on its holding that the taxpayers were employees of their respective personal service corporations rather than employees of the professional hockey club. *Id.* at 1254. This holding was based on two points. First, the Court of Appeals concluded that we had used a doctrinaire approach requiring that any individual who provides services as a member of a "team" should be automatically considered an employee of the team organization. Thus, the Court of Appeals stated:

> It seems to this Court that legal analysis is forgotten if we simply measure the control element of an employment relationship by whether the employee is or is not a member of a superficially defined "team." Eventually, the issue becomes mired in a game of definitions: If the organizational structure is itself mislabeled a "team," a personal service corporation, as a matter of law, is a forbidden tax deferment tool for each and every person providing his or her services to that organization. On the other hand, if the organization to which the services are provided is not defined as a "team," then those same service-providers are free to create a PSC and subject that PSC's legitimacy to traditional common law and tax code analysis, regardless of the level of control exerted over those persons by the organization. Such an arbitrary approach is specious at best. [*Sargent v. Commissioner,* 929 F.2d at 1256.]

We agree with the Court of Appeals that the mere use of the word "team" to describe the organization that is the recipient of personal services is not determinative of employer status. However, we do not believe that we applied such a superficial standard in *Sargent.*

In *Sargent,* we dealt with a specific professional sports organization that owned and operated a professional hockey team in the National Hockey League. In deciding that the taxpayers were employees of the organization that owned and operated the team, we relied on specific facts regarding the taxpayers' relationships with the professional hockey

---

[11] In *Johnson v. Commissioner, supra* at 893, we found that this second prong of the two-part test had not been met. We found that there was no contract between the taxpayer's personal service corporation and the service recipient. Accordingly, for purposes of argument, we assumed, without deciding, that the first prong of the two-part test had been satisfied—i.e., that the personal service corporation had the right to direct and control the taxpayer's activities in "some meaningful sense." *Id.* at 891–892. In *Johnson,* we stated:

We accept *arguendo* that the * * * [personal service corporation] agreement [with the taxpayer] was a valid contract * * *. We also accept *arguendo* that the * * * agreement gave * * * [the personal service corporation] a right of control over [the taxpayer's] services * * * [*Id.*]

club.[12] The taxpayers in *Sargent* argued that, by virtue of their individual personal talents, they retained control of their own playing activities despite the specific elements of control that were retained and exercised by the club over when, where, how, and how much they would play. It was in this factual context that we said that the nature of team sports "must be taken into account in determining the existence of an employer-employee relationship in accordance with common law principles." *Sargent v. Commissioner,* 93 T.C. at 579. Nowhere in *Sargent* did we state or imply that the mere description of the service recipient as a "team" would be determinative.[13] In light of our findings of fact in *Sargent* regarding the reality of the relationships between the individual players and the club, we discerned nothing to indicate that the personal service corporations had any "meaningful" control over the performance of the individual hockey players' activities as members of the hockey team.

The Court of Appeals' apparent reason for holding that the taxpayers in *Sargent* were employees of their personal service corporations, as opposed to the club, was the language of the written agreements between the individual taxpayers and their personal service corporations, and between the per-

---

[12] Included in our findings of fact was that:

Each memorandum of agreement gave the club the right to sell, transfer or assign, or loan out the services of Sargent and Christoff, respectively.

Each memorandum of agreement provided that Sargent and Christoff, respectively, would not, without the club's consent, engage in any other athletic sport nor make any public appearances, sponsorships, etc., relating to the services performed for the club.

The club provided Sargent and Christoff with uniforms and hockey equipment during the years in issue. As between the club and petitioners, the club controlled the scheduling of the games in which the Minnesota North Stars team would play. During a game, the coach of the club had the responsibility of deciding which players would play and for how long and the strategy of play. The coach was also responsible for conducting the practices which the players were required to attend. Training camps were held by the club and were run by the coach with the assistance of the general manager. If a player with a contract failed to show up at training camp, he could be fined pursuant to the NHL rules. [*Sargent v. Commissioner,* 93 T.C. 572, 577 (1989), revd. 929 F.2d 1252 (8th Cir. 1991).]

We also found that each of the individual taxpayers guaranteed to the club that he would personally render the services called for in the contracts between their personal service corporations and the club. *Id.* at 574, 576.

[13] As we have stated:

Whether or not an employer-employee relationship exists is a question which must be determined on the basis of the specific facts and circumstances involved. *Simpson v. Commissioner,* 64 T.C. 974, 984 (1975); *Ellison v. Commissioner,* 55 T.C. 142, 152 (1970); *Hand v. Commissioner,* 16 T.C. 1410, 1414 (1951). Sec. 31.3121(d)–1(c)(3), Employment Tax Regs. * * * [*Professional & Executive Leasing, Inc. v. Commissioner,* 89 T.C. 225, 232 (1987), affd. 862 F.2d 751 (9th Cir. 1988).]

See also *Weber v. Commissioner,* 103 T.C. 378, 386–387 (1994).

sonal service corporations and the club, whose literal terms appeared to recognize the personal service corporations' controlling position as employers. *Sargent v. Commissioner,* 929 F.2d at 1256–1258.[14] The Court of Appeals did not refer to any other facts that would indicate that the personal service corporations in *Sargent* had a right to direct and control the activities of the individual taxpayers "in some meaningful sense." While we agree that contract terms are important in determining whether a personal service corporation is to be recognized as the true employer of the individual service provider, we do not believe that the mere existence of such terms in a contract is sufficient when the reality of the relationship is otherwise. As we have previously held:

> A contract purporting to create an employer-employee relationship will not control where the common law factors (as applied to the facts and circumstances) establish that the relationship does not exist. In *Bartels v. Birmingham,* * * * [332 U.S. 126 (1947)], the Supreme Court was asked to determine whether certain orchestra members were employees of the orchestra leader or of the operators of various dance halls where they performed. After applying the common law rules to the facts of the case, the Court held that the orchestra leader was the employer (and therefore responsible for the employment tax) despite the formal contractual agreement designating the proprietors of the dance halls as the employers. * * * [*Professional & Executive Leasing, Inc. v. Commissioner,* 89 T.C. 225, 233 (1987), affd. 862 F.2d 751 (9th Cir. 1988).]

In *Professional & Executive Leasing,* the contracts literally purported to give control over the individual service providers to the taxpayer-corporation. Nevertheless, as the Court of Appeals for the Ninth Circuit observed: "The right to control, however, was at best illusory." *Professional & Executive Leasing, Inc. v. Commissioner,* 862 F.2d at 754.

---

[14] The Court of Appeals for the Eighth Circuit's opinion perceives an inconsistency between our opinions in *Sargent* and *Pflug v. Commissioner,* T.C. Memo. 1989–615. *Sargent v. Commissioner,* 929 F.2d 1252, 1257 (8th Cir. 1991). The issue before the Court in *Pflug* was whether the taxpayer (an actress) was an employee of her husband's wholly owned production corporation, as the taxpayer contended, or whether the taxpayer was an independent contractor subject to self-employment tax, as the Government contended. Considering only those arguments, on that narrow issue, in light of the particular facts presented, the Court in *Pflug* held that the taxpayer was an employee of her husband's wholly owned corporation. The assignment of income doctrine was not an issue in *Pflug* and neither party argued that the ultimate recipient of the taxpayer's personal services, as opposed to her husband's corporation, was her employer. The opinion in *Pflug* does not even cite *Sargent.* However, if one were to still perceive any inconsistency between *Sargent* and *Pflug,* it should be clear that our holding in *Sargent,* which was reviewed by the full Court, embodies this Court's position as opposed to any perceived inconsistent statement in a memorandum opinion.

We will continue to examine all the facts and circumstances in order to determine the reality of who has control over the manner and means by which the individual service provider delivers services. Any other approach would simply elevate form over substance so as to thwart the assignment of income doctrine that requires compensation to be taxed to the person who earns it, regardless of "anticipatory arrangements and contracts however skilfully devised". *Lucas v. Earl,* 281 U.S. 111, 114–115 (1930). In this respect, we believe that Judge Arnold's dissent in *Sargent* captured the essence of that case when he wrote: "The idea that the coach issued orders to Sargent and Christoff in their capacity as corporate officers, which orders they then relayed to themselves as corporate employees, is fanciful." *Sargent v. Commissioner,* 929 F.2d at 1261. After carefully reconsidering our position in *Sargent v. Commissioner, supra,* in light of its reversal by the Court of Appeals for the Eighth Circuit, we conclude that our approach in *Sargent* was correct.[15] We now turn to an analysis of the facts in the instant case.

We first look to what is clearly the most important factor— the right to control the manner and means by which the individual service provider renders the services for which compensation is being paid.[16] The Rockets wanted to acquire the professional basketball services of petitioner for a term of 2 years beginning in the fall of 1984. Being a member of the NBA, the Rockets were required to use the Uniform Player Contract drafted by the NBA. The variable terms of

---

[15] In *Golsen v Commissioner,* 54 T.C. 742, 757 (1970), affd. 445 F.2d 985 (10th Cir. 1971), we stated that we will follow a Court of Appeals' decision that is squarely in point where appeal lies to that court. In the instant case, venue for appeal lies to the Court of Appeals for the Fifth Circuit.

[16] Factors commonly considered by courts in determining the existence of the employer-employee relationship are: (1) The right to control the details of the work; (2) furnishing the tools and the workplace; (3) withholding taxes, workmen's compensation, and unemployment insurance funds; (4) right to discharge; and (5) permanency of the relationship. *Professional & Executive Leasing, Inc. v. Commissioner,* 862 F.2d at 753 (citing *United States v. Silk,* 331 U.S. 704, 714–716 (1947); *Simpson v. Commissioner,* 64 T.C. 974, 984–985 (1975)).

Although each factor is important, the test usually considered fundamental is set out in a Treasury regulation:

"Generally, such relationship exists when the person for whom services are performed has the right to control and direct the individual who performs the services, not only as to the result to be accomplished by the work but also as to the details and means by which that result is accomplished. That is, an employee is subject to the will and control of the employer not only as to what shall be done but how it shall be done. In this connection, it is not necessary that the employer actually direct or control the manner in which the services are performed; it is sufficient if he has the right to do so." [*Id.* (quoting sec. 31.3121(d)–1(c)(2), Employment Tax Regs.).]

the contract for petitioner's services were negotiated between petitioner's attorney and the Rockets' general manager. Petitioner wanted the NBA Uniform Player Contract to be between his personal service corporation and the Rockets. The Rockets wanted to obtain petitioner's services and did not care if his services were obtained by way of a contract with petitioner's corporation, so long as they were able to secure petitioner's services under the terms and conditions required by the standard NBA Uniform Player Contract. Satisfied that this was possible, they were willing to, and did, enter into a standard player contract with petitioner's corporation. The contract was executed on December 11, 1984. The preprinted terms of the 1984 Uniform Player Contract are identical to player contracts entered into with individual players. However, the first paragraph identifies Allen Frazier Leavell, Inc.,[17] as the party who is referred to thereafter as the "Player".

The remaining portions of the contract refer to the obligations of the "player" in a way that clearly indicates that the language of the contract contemplated binding a specific individual person with basketball playing skills to perform services for and under the specific supervision of the Rockets. The first numbered paragraph begins by stating that "The Club hereby employs the Player as a skilled basketball player for a term of <u>two</u> year(s)", and paragraph 9 states that

The Player represents and agrees that he has extraordinary and unique skill and ability as a basketball player, that the services to be rendered by him hereunder cannot be replaced or the loss thereof adequately compensated for in money damages, and that any breach by the Player of this contract will cause irreparable injury to the Club and to its assignees. * * *

The contract requires the "player" to render services under conditions that give the Rockets a great degree of control over his basketball services and many of his personal activities to the extent that they might affect his playing ability or reflect on the Rockets or the NBA. For example, the contract requires that the "player": Attend each training camp; play scheduled games; report at the time and place fixed by the Rockets in good physical condition; give his best services and loyalty to the Rockets; observe and comply with all

---

[17] On the written contract, the term "Inc." was inserted by handwriting.

requirements of the Rockets respecting conduct of its team and its players; play only for the Rockets or its assignees; keep in good physical condition throughout each season; agree to give immediate notice of any injury suffered by him; submit to a medical examination and treatment by a physician designated by the Rockets; and report to any other club to whom his contract has been assigned.

The contract also requires that the "player": Be neatly and fully attired in public and conduct himself according to the highest standards on and off the court; refrain from any conduct that is detrimental to the best interests of the Rockets or of the association; not engage in sports endangering his health or safety; allow the Rockets or the association to take his picture at such times as the Rockets or association may designate; make himself available for interviews by representatives of the media conducted at reasonable times; agree to participate in all other reasonable promotional activities of the Rockets and the association; and conform his personal conduct to standards of good citizenship, good moral character, and good sportsmanship.

Under the contract, the Rockets had the right to impose fines, sanctions, and other disciplinary measures on the "player" for violating the requirements of the Rockets respecting conduct of its team and players. The contract also provides that the association could impose fines, sanctions, and other disciplinary measures.

The terms of the Uniform Player Contract exhibit an intent to give the Rockets a degree of control over the activities of an individual "player" that transcends the control most employers have over their employees. However, as written, the December 11, 1984, player contract, designated Allen Frazier Leavell, Inc., as the "player" rather than petitioner. The 1984 Uniform Player Contract made no specific reference to petitioner as an individual. The Rockets recognized this. While the Rockets were willing to obtain petitioner's services by executing a contract with his corporation, the Rockets were not willing to jeopardize the rights that they would have otherwise obtained by contracting with an individual player. This problem was solved by requiring petitioner to individually execute a written agreement with the Rockets, which was titled "Personal Guarantee By Player". In this agreement, petitioner promised that he would personally per-

form the services required of the "player" in accordance with the terms and conditions of the December 11, 1984, player contract. The consideration for petitioner's personal agreement to be bound to the terms of the NBA Uniform Player Contract was the Rockets' promise to pay compensation for his basketball services to corporation. Without petitioner's personal agreement, which was also executed on December 11, 1984, the Rockets would not have signed the Uniform Player Contract in question. With the agreement, the Rockets were in the same position with respect to their rights to control petitioner's activities as if he had personally signed the player contract.[18] Given these facts, the personal service corporation's rights to control the manner and means by which petitioner performed the basketball and related activities required by the player contract were at best illusory.

Petitioner argues that his point guard position placed him in a leadership position where he could control decisions about his and his teammates' playing tactics. However, the discretion inherent in petitioner's position as a skilled professional basketball player is not sufficient to remove him from employee status. It is well recognized that the extent of control necessary for a professional to qualify as an employee is less than that necessary for a nonprofessional. *Professional & Executive Leasing, Inc. v. Commissioner*, 862 F.2d 751 (9th Cir. 1988), affg. 89 T.C. 225 (1987). The type of discretion that petitioner had as a player is not sufficient to negate the overall control of the Rockets, who retained the right to direct petitioner's activities as to where, when, and how he was to perform services. The Rockets' coach had the right to control player activity during training camp, practice sessions, and games. If the Rockets were dissatisfied with petitioner's response to directives, they had the power to reduce his playing time, fine him, suspend him, or ultimately remove him from the team.[19]

---

[18] It is unclear from the record whether the Rockets were aware of, or even inquired about, the terms of the agreement between petitioner and his corporation. Had they inquired, they would have known that there was no written contract giving Allen Frazier Leavell, Inc., rights to petitioner's services. It is doubtful that the Rockets would have relied on an unwritten agreement, the terms of which may have existed only in petitioner's mind. However, by requiring petitioner's personal written agreement that he would individually provide the services and meet the obligation required of the "player", pursuant to the Dec. 11, 1984, Uniform Player Contract, these potential problems were obviated.

[19] The employer-employee relationship between the Rockets and petitioner is further evidenced by the fact that the Rockets, in association with the NBA of which it was a member,

Where, as in this case, an individual taxpayer attempts to provide his services through a personal service corporation, the determination of whether income derived from such services should be attributed to the individual taxpayer or his personal service corporation depends on who is the actual employer of the individual taxpayer. This determination must be based on all the facts and circumstances. Based on all the facts and circumstances in this case, we hold that petitioner was the employee of the Rockets. It follows that the compensation paid by the Rockets in return for petitioner's services is attributable to petitioner.

*Decision will be entered under Rule 155.*

Reviewed by the Court.

CHABOT, PARKER, COHEN, GERBER, PARR, HALPERN, and BEGHE, *JJ.,* agree with this majority opinion.

CHIECHI, *J.,* concurs in the result only.

---

## APPENDIX

### NATIONAL BASKETBALL ASSOCIATION
### UNIFORM PLAYER CONTRACT

(Rookie or Veteran—Two or More Seasons)

THIS AGREEMENT made this 11 day of December 1984 by and between the Houston Rockets (hereinafter called the "Club"), a member of the National Basketball Association (hereinafter called the "Association") and Allen Frazier Leavell, Inc. whose address is shown below (hereinafter called the "Player").

### WITNESSETH:

In consideration of the mutual promises hereinafter contained, the parties hereto promise and agree as follows:

1. The Club hereby employs the Player as a skilled basketball player for a term of two year(s) from the 1st day of September 1984. The Player's employment during each year covered by this contract shall include

---

provided petitioner and other Rockets basketball players the facilities for training camps, practices, games, and paid the players' transportation, housing, and meal costs while players were attending away games. Likewise, the 2-year duration of the 1984 Uniform Player Contract is consistent with our finding that an employer-employee relationship existed between the Rockets and petitioner. See *supra* note 16.

attendance at each training camp, playing the games scheduled for the Club's team during each schedule season of the Association, playing all exhibition games scheduled by the Club during and prior to each schedule season, playing (if invited to participate) in each of the Association's All-Star Games and attending every event (including, but not limited to, the All-Star Game luncheon and/or banquet) conducted in association with such All-Star Games, and playing the playoff games subsequent to each schedule season. Players other than rookies will not be required to attend training camp earlier than twenty-eight days prior to the first game of each of the Club's schedule seasons. Rookies may be required to attend training camp at an earlier date. Exhibition games shall not be played on the three days prior to the opening of the Club's regular season schedule, nor on the day prior to a regularly scheduled game, nor on the day prior to and the day following the All-Star Game. Exhibition games prior to each schedule season shall not exceed eight (including intra-squad games for which admission is charged) and exhibition games during each regularly scheduled season shall not exceed three.

2. The Club agrees to pay the Player for rendering services described herein the sum of $see addendum per year, (less all amounts required to be withheld from salary by Federal, State and local authorities and exclusive of any amount which the Player shall be entitled to receive from the Player Playoff Pool) in twelve equal semi-monthly payments beginning with the first of said payments on November 1st of each season above described and continuing with such payments on the first and fifteenth of each month until said sum is paid in full; provided, however, if the Club does not qualify for the playoffs, the payments for the year involved which would otherwise be due subsequent to the conclusion of the schedule season shall become due and payable immediately after the conclusion of the schedule season.

3. The Club agrees to pay all proper and necessary expenses of the Player, including the reasonable board and lodging expenses of the Player while playing for the Club "on the road" and during training camp if the Player is not then living at home. The Player, while "on the road" (and at training camp only if the Club does not pay for meals directly), shall be paid a meal expense allowance as set forth in the Agreement currently in effect between the National Basketball Association and National Basketball Players Association. No deductions from such meal expense allowance shall be made for meals served on an airplane. While the Player is at training camp (and if the Club does not pay for meals directly), the meal expense allowance shall be paid in weekly installments commencing with the first week of training camp. For the purposes of this paragraph, the Player shall be considered to be "on the road" from the time the Club leaves its home city until the time the Club arrives back at its home city. In addition, the Club agrees to pay $50.00 per week to the Player for the four weeks prior to the first game of each of the Club's schedule seasons that the Player is either in attendance at training camp or engaged in playing the exhibition schedule.

4. The Player agrees to observe and comply with all requirements of the Club respecting conduct of its team and its players, at all times whether

on or off the playing floor. The Club may, from time to time during the continuance of this contract, establish reasonable rules for the government of its players "at home" and "on the road," and such rules shall be part of this contract as fully as if herein written and shall be binding upon the Player. For any violation of such rules or for any conduct impairing the faithful and thorough discharge of the duties incumbent upon the Player, the Club may impose reasonable fines upon the Player and deduct the amount thereof from any money due or to become due to the Player during the season in which such violation and/or conduct occurred. The Club may also suspend the Player for violation of any rules so established, and, upon such suspension, the compensation payable to the Player under this contract may be reduced in the manner provided in the Agreement currently in effect between the National Basketball Association and National Basketball Players Association. When the Player is fined or suspended, he shall be given notice in writing, stating the amount of the fine or the duration of the suspension and the reason therefor.

5. The Player agrees (a) to report at the time and place fixed by the Club in good physical condition; (b) to keep himself throughout each season in good physical condition; (c) to give his best services, as well as his loyalty to the Club, and to play basketball only for the Club and its assignees; (d) to be neatly and fully attired in public and always to conduct himself on and off the court according to the highest standards of honesty, morality, fair play and sportsmanship; and (e) not to do anything which is detrimental to the best interests of the Club or of the Association.

6. (a) If the Player, in the judgment of the Club's physician, is not in good physical condition at the date of his first scheduled game for the Club, or if, at the beginning of or during any season, he fails to remain in good physical condition (unless such condition results directly from any injury sustained by the Player as a direct result of participating in any basketball practice or game played for the Club during such season), so as to render the Player, in the judgment of the Club's physician, unfit to play skilled basketball, the Club shall have the right to suspend such Player until such time as, in the judgment of the Club's physician, the Player is in sufficiently good physical condition to play skilled basketball. In the event of such suspension, the annual sum payable to the Player for each season during such suspension shall be reduced in the same proportion as the length of the period during which, in the judgment of the Club's physician, the Player is unfit to play skilled basketball, bears to the length of such season.

(b) If the Player is injured as a direct result of participating in any basketball practice or game played for the Club, the Club will pay the Player's reasonable hospitalization and medical expenses (including doctor's bills), provided that the hospital and doctor are selected by the Club, and provided further that the Club shall be obligated to pay only those expenses incurred as a result of continuous medical treatment caused solely by and relating directly to the injury sustained by the Player. If, in the judgment of the Club's physician, the Player's injuries resulted directly from playing for the Club and render him unfit to play skilled basketball, then, so long as such unfitness continues, but in no event after the Player

has received his full salary for the season in which the injury was sustained, the Club shall pay to the Player the compensation prescribed in paragraph 2 of this contract for such season. The Club's obligations hereunder shall be reduced by any workmen's compensation benefits (which, to the extent permitted by law, the Player hereby assigns to the Club) and any insurance provided for by the Club whether paid or payable to the Player, and the Player hereby releases the Club from any and every other obligation or liability arising out of any such injuries.

(c) The Player hereby releases and waives every claim he may have against the Association and every member of the Association, and against every director, officer, stockholder, trustee, partner, and employee of the Association and/or any member of the Association (excluding persons employed as players by any such member), arising out of or in connection with any fighting or other form of violent and/or unsportsmanlike conduct occurring (on or adjacent to the playing floor or any facility used for practices or games) during the course of any practice and/or any exhibition, championship season, and/or play-off game.

7. The Player agrees to give the Club's coach, or to the Club's physician, immediate notice of any injury suffered by him, including the time, place, cause and nature of such injury.

8. Should the Player suffer an injury as provided in the preceding section, he will submit himself to a medical examination and treatment by a physician designated by the Club. Such examination when made at the request of the Club shall be at its expense, unless made necessary by some act or conduct of the Player contrary to the terms of this contract.

9. The Player represents and agrees that he has extraordinary and unique skill and ability as a basketball player, that the services to be rendered by him hereunder cannot be replaced or the loss thereof adequately compensated for in money damages, and that any breach by the Player of this contract will cause irreparable injury to the Club and to its assignees. Therefore, it is agreed that in the event it is alleged by the Club that the Player is playing, attempting or threatening to play, or negotiating for the purpose of playing, during the term of this contract, for any other person, firm, corporation or organization, the Club and its assignees (in addition to any other remedies that may be available to them judicially or by way of arbitration) shall have the right to obtain from any court or arbitrator having jurisdiction, such equitable relief as may be appropriate, including a decree enjoining the Player from any further such breach of this contract, and enjoining the Player from playing basketball for any other person, firm, corporation or organization during the term of this contract. In any suit, action or arbitration proceeding brought to obtain such relief, the Player does hereby waive his right, if any, to trial by jury, and does hereby waive his right, if any, to interpose any counterclaim or set-off for any cause whatever.

10. The Club shall have the right to sell, exchange, assign or transfer this contract to any other professional basketball Club and the Player agrees to accept such sale, exchange, assignment or transfer and to faithfully perform and carry out this contract with the same force and effect as if it had been entered into by the Player with the assignee Club instead

of with this Club. The Player further agrees that, should the Club contemplate the sale, exchange, assignment or transfer of this contract to another professional basketball Club or Clubs, the Club's physician may furnish to the physicians and officials of such other Club or Clubs all relevant medical information relating to the Player.

11. In the event that the Player's contract is sold, exchanged, assigned or transferred to any other professional basketball Club, all reasonable expenses incurred by the Player in moving himself and his family from the home city of the Club to the home city of the Club to which such sale, exchange, assignment or transfer is made, as a result thereof, shall be paid by the assignee Club. Such assignee Club hereby agrees that its acceptance of the assignment of this contract constitutes agreement on its part to make such payment.

12. In the event that the Player's contract is assigned to another Club the Player shall forthwith be notified orally or by a notice in writing, delivered to the Player personally or delivered or mailed to his last known address, and the Player shall report to the assignee Club within forty-eight hours after said notice has been received or within such longer time for reporting as may be specified in said notice. If the Player does not report to the Club to which his contract has been assigned within the aforesaid time, the Player may be suspended by such Club and he shall lose the sums which would otherwise be payable to him as long as the suspension lasts.

13. The Club will not pay and the Player will not accept any bonus or anything of value for winning any particular Association game or series of games or for attaining a certain position by the Club's team in the standing of the league operated by the Association as of a certain date, other than the final standing of the team.

14. This contract shall be valid and binding upon the Club and the Player immediately upon its execution. The Club agrees to file a copy of this contract with the Commissioner of the Association prior to the first game of the schedule season or within forty-eight (48) hours of its execution, whichever is later; provided, however, the Club agrees that if the contract is executed prior to the start of the schedule season and if the Player so requests, it will file a copy of this contract with the Commissioner of the Association within thirty (30) days of its execution, but not later than the date hereinabove specified. If pursuant to the Constitution and By-Laws of the Association, the Commissioner disapproves this contract within ten (10) days after the filing thereof in his office, this contract shall thereupon terminate and be of no further force or effect and the Club and the Player shall thereupon be relieved of their respective rights and liabilities thereunder.

15. The Player and the Club acknowledge that they have read and are familiar with Section 35 of the Constitution of the Association, a copy of which, as in effect on the date of this Agreement, is attached hereto. Such section provides that the Commissioner and the Board of Governors of the Association are empowered to impose fines upon the Player and/or upon the Club for causes and in the manner provided in such section. The Player and the Club, each for himself and itself, promises promptly to pay

to the said Association each and every fine imposed upon him or it in accordance with the provisions of said section and not permit any such fine to be paid on his or its behalf by anyone other than the person or Club fined. The Player authorizes the Club to deduct from his salary payments any fines imposed on or assessed against him.

16. Notwithstanding any provisions of the Constitution or of the By-Laws of the Association, it is agreed that if the Commissioner of the Association shall, in his sole judgment, find that the Player has bet, or has offered or attempted to bet, money or anything of value on the outcome of any game participated in by any Club which is a member of the Association, the Commissioner shall have the power in his sole discretion to suspend the Player indefinitely or to expel him as a player for any member of the Association and the Commissioner's finding and decision shall be final, binding, conclusive and unappealable. The Player hereby releases the Commissioner and waives every claim he may have against the Commissioner and/or the Association, and against every member of the Association, and against every director, officer, stockholder, trustee and partner of every member of the Association, for damages and for all claims and demands whatsoever arising out of or in connection with the decision of the Commissioner.

17. The Player and the Club acknowledge and agree that the Player's participation in other sports may impair or destroy his ability and skill as a basketball player. The Player and the Club recognize and agree that the Player's participation in basketball out of season may result in injury to him. Accordingly, the Player agrees that he will not engage in sports endangering his health or safety (including, but not limited to, professional boxing or wrestling, motorcycling, moped-riding, auto racing, sky-diving, and hang-gliding); and that, except with the written consent of the Club, he will not engage in any game or exhibition of basketball, football, baseball, hockey, lacrosse, or other athletic sport, under penalty of such fine and suspension as may be imposed by the Club and/or the Commissioner of the Association. Nothing contained herein shall be intended to require the Player to obtain the written consent of the Club in order to enable the Player to participate in, as an amateur, the sport of golf, tennis, handball, swimming, hiking, softball or volleyball.

18. The Player agrees to allow the Club or the Association to take pictures of the Player, alone or together with others, for still photographs, motion pictures or television, at such times as the Club or the Association may designate, and no matter by whom taken may be used in any manner desired by either of them for publicity or promotional purposes. The rights in any such pictures taken by the Club or by the Association shall belong to the Club or the Association, as their interests may appear. The Player agrees that, during each playing season, he will not make public appearances, participate in radio or television programs or permit his picture to be taken or write or sponsor newspaper or magazine articles or sponsor commercial products without the written consent of the Club, which shall not be withheld except in the reasonable interests of the Club or professional basketball. Upon request, the Player shall consent to and make himself available for interviews by representatives of the media conducted at

reasonable times. In addition to the foregoing, the Player agrees to participate, upon request, in all other reasonable promotional activities of the Club and the Association.

19. The Player agrees that he will not, during the term of this contract, directly or indirectly entice, induce, persuade or attempt to entice, induce or persuade any player or coach who is under contract to any member of the Association to enter into negotiations for or relating to his services as a basketball player or coach, nor shall he negotiate for or contract for such services, except with the prior written consent of such member of the Association. Breach of this paragraph, in addition to the remedies available to the Club, shall be punishable by fine to be imposed by the Commissioner of the Association and to be payable to the Association out of any compensation due or to become due to the Player hereunder or out of any other moneys payable to him as a basketball player. The Player agrees that the amount of such fine may be withheld by the Club and paid over to the Association.

20. (a) In the event of an alleged default by the Club in the payments to the Player provided for by this contract, or in the event of an alleged failure by the Club to perform any other material obligation agreed to be performed by the Club hereunder, the Player shall notify both the Club and the Association in writing of the facts constituting such alleged default or alleged failure. If neither the Club nor the Association shall cause such alleged default or alleged failure to be remedied within five (5) days after receipt of such written notice, the National Basketball Players Association shall, on behalf of the Player, have the right to request that the dispute concerning such alleged default or alleged failure be referred immediately to the Impartial Arbitrator in accordance with Article XXI, Section 2(h), of the Agreement currently in effect between the National Basketball Association and National Basketball Players Association. If, as a result of such arbitration, an award issues in favor of the Player, and if neither the Club nor the Association complies with such award within ten (10) days after the service thereof, the Player shall have the right, by a further written notice to the Club and the Association, to terminate this contract.

(b) The Club may terminate this contract upon written notice to the Player (but only after complying with the waiver procedure provided for in subparagraph (f) of this paragraph (20) if the Player shall do any of the following:

(1) at any time, fail, refuse or neglect to conform his personal conduct to standards of good citizenship, good moral character and good sportsmanship, to keep himself in first class physical condition or to obey the Club's training rules; or

(2) at any time, fail, in the sole opinion of the Club's management, to exhibit sufficient skill or competitive ability to qualify to continue as a member of the Club's team (provided, however, that if this contract is terminated by the Club, in accordance with the provisions of this subparagraph, during the period from the fifty-sixth day after the first game of any schedule season of the Association through the end of such schedule season, the Player shall be entitled to receive his full salary for said season); or

(3) at any time, fail, refuse or neglect to render his services hereunder or in any other manner materially breach this contract.

(c) If this contract is terminated by the Club by reason of the Player's failure to render his services hereunder due to disability caused by an injury to the Player resulting directly from his playing for the Club and rendering him unfit to play skilled basketball, and notice of such injury is given by the Player as provided herein, the Player shall be entitled to receive his full salary for the season in which the injury was sustained, less all workmen's compensation benefits (which, to the extent permitted by law, the Player hereby assigns to the Club) and any insurance provided for by the Club paid or payable to the Player by reason of said injury.

(d) If this contract is terminated by the Club during the period designated by the Club for attendance at training camp, payment by the Club of the Player's board, lodging and expense allowance during such period to the date of termination and of the reasonable travelling expenses of the Player to his home city and the expert training and coaching provided by the Club to the Player during the training season shall be full payment to the Player.

(e) If this contract is terminated by the Club during any playing season, except in the case provided for in subparagraph (c) of this paragraph 20, the Player shall be entitled to receive as full payment hereunder a sum of money which, when added to the salary which he has already received during such season, will represent the same proportionate amount of the annual sum set forth in paragraph 2 hereof as the number of days of such season then past bears to the total number of days of such schedule season, plus the reasonable travelling expenses of the Player to his home.

(f) If the Club proposes to terminate this contract in accordance with subparagraph (b) of this paragraph 20, the applicable waiver procedure shall be as follows:

(1) The Club shall request the Association Commissioner to request waivers from all other Clubs. Such waiver request must state that it is for the purpose of terminating this contract and it may not be withdrawn.

(2) Upon receipt of the waiver request, any other Club may claim assignment of this contract at such waiver price as may be fixed by the Association, the priority of claims to be determined in accordance with the Association's Constitution or By-Laws.

(3) If this contract is so claimed, the Club agrees that it shall, upon the assignment of this contract to the claiming Club, notify the Player of such assignment as provided in paragraph 12 hereof, and the Player agrees he shall report to the assignee Club as provided in said paragraph 12.

(4) If the contract is not claimed, the Club shall promptly deliver written notice of termination to the Player at the expiration of the waiver period.

(5) To the extent not inconsistent with the foregoing provisions of this subparagraph (f) the waiver procedures set forth in the Constitution and By-Laws of the Association, a copy of which, as in effect on the date of this agreement, is attached hereto, shall govern.

(g) Upon any termination of this contract by the Player, all obligations of the Club to pay compensation shall cease on the date of termination,

except the obligation of the Club to pay the Player's compensation to said date.

21. In the event of any dispute arising between the Player and the Club relating to any matter arising under this contract, or concerning the performance or interpretation thereof (except for a dispute arising under paragraph 9 hereof), such dispute shall be resolved in accordance with the Grievance and Arbitration Procedure set forth in the Agreement currently in effect between the National Basketball Association and the National Basketball Players Association.

22. Nothing contained in this contract or in any provision of the Constitution or By-Laws of the Association shall be construed to constitute the Player a member of the Association or to confer upon him any of the rights or privileges of a member thereof.

---

Addendum

*Salary*
1984–85                                        $132,000
*Bonus* (Limited To $18,000 Total)

If Rockets win 30 games, Player earns $1,000 and $1,000 for each win beyond 30 for the 1984–85 season.

If Player averages more than ten minutes per game for the 1984–85 season, player earns $5,000.

If Player is among the top three on the Club in average assists for the 1984–85 season, player earns $5,000.

If the Player is among the top three on the club in average steals for the 1984–85 season, Player earns $5,000.

Any bonus earned will be paid upon completion of the 1985 NBA playoffs.

*Salary*
1985–86                                        $200,000

23. This contract contains the entire agreement between the parties and there are no oral or written inducements, promises or agreements except as contained herein.

EXAMINE THIS CONTRACT CAREFULLY BEFORE SIGNING IT

IN WITNESS WHEREOF the Player has hereunto signed his name and the Club has caused this contract to be executed by this duly authorized officer.

Witnesses:

/s/ Ray Patterson

/s/ James A. Foley                 By Ray Patterson
                                   Title: President and General Manger

/s/ <u>Lance Jay Luchnick</u>
   Attorney At Law             /s/ <u>Allen Leavell</u>
                             Allen Leavell Player
Player's Address <u>6735 Gentle Bend, Houston, Tx. 77069</u>

RECEIVED & RECORDED
DEC 13, 1984
/s/ <u>David J. Stern</u>
COMMISSIONER

---

### EXCERPT FROM CONSTITUTION OF THE ASSOCIATION
### MISCONDUCT OF OFFICIALS AND OTHERS

35. (a) The provisions of this Section shall govern all members, and officers, managers, coaches, players and other employees of a member and all officials and other employees of the Association, all hereinafter referred to as "persons." Each member shall provide and require in every contract with any of its officers, managers, coaches, players or other employees that they shall be bound and governed by the provisions of this Section. Each member, at the direction of the Board of Governors or the Commissioner, as the case may be, shall take such action as the Board or the Commissioner may direct in order to effectuate the purposes of this Section.

(b) The Commissioner shall direct the dismissal and perpetual disqualification from any further association with the Association or any of its members, of any person found by the Commissioner after a hearing to have been guilty of offering, agreeing, conspiring, aiding or attempting to cause any game of basketball to result otherwise than on its merits.

(c) Any person who gives, makes, issues, authorizes or endorses any statement having, or designed to have, an effect prejudicial or detrimental to the best interests of basketball or of the Association or of a member or its team, shall be liable to a fine not exceeding $1,000, to be imposed by the Board of Governors. The member whose officer, manager, coach, player or other employee has been so fined shall pay the amount of the fine should such person fail to do so within ten (10) days of its imposition.

(d) If in the opinion of the Commissioner any other act or conduct of a person at or during a pre-season, championship, playoff or exhibition game has been prejudicial to or against the best interests of the Association or the game of basketball, the Commissioner shall impose upon such person a fine not exceeding $1,000 in the case of a member, officer, manager or coach of a member, or $10,000 in the case of a player or other employee, or may order for a time the suspension of any such person from any connection or duties with pre-season, championship, playoff or exhibition games, or he may order both such fine and suspension.

(e) The Commissioner shall have the power to suspend for a definite or indefinite period, or to impose a fine not exceeding $1,000, or inflict both such suspension and fine upon any person who, in his opinion, shall have been guilty of conduct prejudicial or detrimental to the Association.

(f) The Commissioner shall have the power to levy a fine of $1,000 upon any Governor or Alternate Governor who, in the opinion of the Commissioner, has been guilty of making statements to the press damaging to the Association.

(g) Any person who, directly or indirectly, entices, induces, persuades or attempts to entice, induce, or persuade any player, coach, trainer, general manager or any other person who is under contract to any other member of the Association to enter into negotiations for or relating to his services or negotiates or contracts for such services shall, on being charged with such tampering, be given an opportunity to answer such charges after due notice and the Commissioner shall have the power to decide whether or not the charges have been sustained; in the event his decision is that the charges have been sustained, then the Commissioner shall have the power to suspend such person for a definite or indefinite period, or to impose a fine not exceeding $5,000, or inflict both such suspension and fine upon any such person.

(h) Any person who, directly or indirectly, wagers money or anything of value on the outcome of any game played by a team in the league operated by the Association shall, on being charged with such wagering, be given an opportunity to answer such charges after due notice, and the decision of the Commissioner shall be final, binding and conclusive and unappealable. The penalty for such offense shall be within the absolute and sole discretion of the Commissioner and may include a fine, suspension, expulsion and/or perpetual disqualification from further association with the Association or any of its members.

(i) Except for a penalty imposed under subparagraph (h) of this paragraph 35, the decisions and acts of the Commissioner pursuant to paragraph 35 shall be appealable to the Board of Governors who shall determine such appeals in accordance with such rules and regulations as may be adopted by the Board in its absolute and sole discretion.

---

SWIFT, *J.*, concurring in the result only: Upon further consideration and with the benefit of the opinion of the U.S. Court of Appeals for the Eighth Circuit in *Sargent v. Commissioner,* 929 F.2d 1252 (8th Cir. 1991), revg. 93 T.C. 572 (1989), I believe the majority opinion incorrectly relies too heavily on employee-independent contractor principles in analyzing the relationships of petitioner and his personal service corporation (PSC) with the Rockets. I would decide the issue before us on the basis of the two-pronged control or contractual analysis of *Johnson v. Commissioner,* 78 T.C. 882 (1982), affd. without published opinion 734 F.2d 20 (9th Cir. 1984), that traditionally has been used in analyzing the issue of the assignment of income as between a PSC and its individual owners. Under that analysis and based on certain undis-

puted and particularly pertinent facts in this case, I believe that a conclusion would be required herein that petitioner individually, and not petitioner's PSC, is to be charged with the income relating to petitioner's services as a basketball player for the Houston Rockets.

## Employee-Independent Contractor Analysis

After expressly finding that petitioner entered into an exclusive employment contract with his PSC for his basketball services (see majority op. p. 142) and that petitioner's PSC entered into a contract to provide basketball services to the Rockets (majority op. p. 142), the majority's analysis focuses on the "control" that is exercised by the Rockets and by the Rockets' coach over petitioner as a basketball player, and the majority concludes that petitioner was an "employee" of the Rockets with regard to such services and therefore that the income received from the Rockets should be charged or assigned to petitioner individually, not to petitioner's PSC. This analysis is directly contrary to and inconsistent with the majority's findings that petitioner had an employment contract with his PSC for his basketball services and that petitioner's PSC contracted to provide basketball services to the Rockets. Moreover, the majority opinion overlooks the fact that the team or coach's control that is exercised over players on competitive sports teams is inherent in team sports. Such control has little, if anything, to do with whether the player is an employee of, or an independent contractor with, the team. Such control simply reflects the way team sports are played.

Whether one considers a Little League baseball team, a high school basketball or wrestling team, a college football team, or a professional basketball, baseball, football, hockey, or soccer team, one must acknowledge that with each team sport, with each team, with each coach, and with each player, in order for the team to win and to be competitive, the team and the coach control many aspects of the game and of the individual player's participation in each game and on the team. Such control, in the context of competitive team sports, is simply the way the game is played by everyone—male and female, volunteer and professional, independent contractor and employee. The team simply plays better when

the players are coached, when the players play as a team, and when the coach has control over most aspects of the game and of the individual player's participation on the team.

Upon further consideration of participation in team sports in the above light, it is evident that the control that is exercised by teams and by coaches over individual players on the teams has little to do with whether a particular individual player is an employee or an independent contractor of the team (and it certainly tells us little to nothing about whether the player is an employee of a PSC). In each situation, the game is played essentially the same. The coach's control is essentially the same. The nature of and degree of control that the team and coach exercise are not affected by whether the player treats himself or herself as a direct employee of the team or as an employee of his or her PSC to which the employee is attempting to attribute the income received from the team.

It should be noted that the parties herein, with regard to petitioner's relationship with the Rockets, do not make an employee-independent contractor argument or analysis in their briefs, and they do not here ask us to determine whether petitioner was an employee or independent contractor of the Rockets. We are asked here simply to apply traditional assignment-of-income principles to the facts before us, to evaluate the bona fide nature of petitioner's alleged contract with his PSC (not just the existence of some amorphous oral contract with no terms), and to evaluate whether the written contract with the Rockets for petitioner's basketball services was, in substance and reality, a contract with petitioner, not with petitioner's PSC.

*Assignment of Income*

Ever since the Court of Appeals for the Tenth Circuit's decision in *United States v. Empey,* 406 F.2d 157 (10th Cir. 1969), it has been clear that even though PSC's may be generally recognized as viable corporations for Federal income tax purposes under *Moline Properties, Inc. v. Commissioner,* 319 U.S. 436 (1943), Federal income tax adjustments may still be appropriate with regard to particular income received for particular services of the individual owners of the PSC's.

See, e.g., *Keller v. Commissioner,* 77 T.C. 1014 (1981), affd. 723 F.2d 58 (10th Cir. 1983), in which the taxpayer's PSC was recognized as a legitimate corporation and some income received by the PSC was taxed to the PSC, but certain other income received by the PSC was taxed to the individual owner of the PSC.

Under the case authority, the fact that a PSC is a viable corporation and has a legitimate business purpose will not preclude the application of the assignment of income doctrine or adjustments under section 482 with respect to particular income received by the PSC where the contractual rights of the PSC vis-a-vis the service recipient with regard to the particular income in question are not established by valid contracts—first, between the service provider and the PSC; and second, between the PSC and the service recipient. See *Johnson v. Commissioner,* 78 T.C. at 890.

As we explained in *Johnson v. Commissioner, supra* at 891, a case involving facts similar to the facts of this case:

> Given the inherent impossibility of logical application of a per se actual earner test, a more refined inquiry has arisen in the form of who controls the earning of the income. An examination of the case law from *Lucas v. Earl* hence reveals two necessary elements before the * * * [PSC], rather than its * * * [service provider], may be considered the controller of the income. First, the * * * [service provider] must be * * * an employee of the * * * [PSC] whom the * * * [PSC] has the right to direct or control in some meaningful sense. Second, there must exist between the * * * [PSC] and the * * * [service recipient] a contract or similar indicium recognizing the * * * [PSC's] controlling position. [Citations and fn. refs. omitted.]

In *Sargent v. Commissioner,* 929 F.2d at 1256–1257, the above statement of this traditional test was approved and quoted verbatim by the Court of Appeals for the Eighth Circuit, and the Court of Appeals explained further—

> the Tax Court * * * [in *Johnson*] ultimately held the contracts to be dispositive of the issue of control:
>
> * * * * * * *
>
> Ultimately, * * * [the taxpayer] was required to pay individual income tax on the entire amount paid to his PSC, but only because his PSC had no contractual arrangement with the * * * [service recipient]. Said the Tax Court regarding the second prong of the "control" test: "[c]rucial is the fact that there was no contract or agreement between the * * * [service recipient] and [the PSC]." We are not faced with such a dilemma in this

case. Not only did \* \* \* [the service provider] have a contractual arrangement with their respective PSC's, thereby passing the first prong of the analysis, each PSC also had a contractual relationship with the \* \* \* [service recipient]. Consistent with its analysis in the past, the Tax Court in *Johnson* concluded that the existence of *bona fide* contracts between the parties satisfied the requisite elements of control. \* \* \* [Citation omitted; emphasis added.]

In *Sargent v. Commissioner, supra,* our opinion at 93 T.C. 572 (1989) was reversed by the Court of Appeals for the Eighth Circuit, but mainly because the Eighth Circuit rejected the team control test that we had enunciated in our opinion. Because the Eighth Circuit concluded that the facts of *Sargent* established the existence of the necessary bona fide contracts between the service providers and the PSC's and between the PSC's and the service recipients, the income was treated by the Eighth Circuit as earned by the PSC's.

The facts of this case are more similar to the facts of *Johnson v. Commissioner, supra,* and, in my opinion, this case should be controlled by the two-pronged control or bona fide contract test set forth in *Johnson v. Commissioner, supra.*

In this case, petitioner did not have a written contract with his PSC, and petitioner has not established any of the specific terms and conditions of a bona fide oral contract between petitioner and his PSC.

A written contract did exist with the Rockets, but in that written contract certain corporate formalities were not adhered to and significant irregularities appear in that petitioner, not his PSC, signed the contract as the player and contracting party. On the first page of the 1984 Uniform Player Contract with the Rockets (1984 Contract), petitioner's individual given first name, his given middle name, and his last name (namely, "Allen Frazier Leavell") are typed in as the "Player" and as a party to the contract. The word "Inc." is handwritten next to petitioner's full given name without any initials or date indicating when the word "Inc." was added to the document. Also, when the word "Inc." was added in handwriting, petitioner's given middle name was not deleted from the contract.

On the signature line on the last page of the 1984 Contract with the Rockets, only petitioner's individual name appears as the "Player" and as a party to the contract. There is no indication on the signature line that petitioner was signing

the 1984 Contract as an officer or representative of his PSC. Nowhere in the 1984 Contract does the correct name of petitioner's PSC (namely, Allen Leavell, Inc.) appear.

In connection with the 1984 Contract, the Rockets required that petitioner individually execute a personal guarantee in which petitioner personally and individually agreed to play professional basketball for the Rockets. Under the terms of the personal guarantee, petitioner agreed to be personally bound by all of the terms and conditions set forth in the 1984 Contract, and petitioner agreed to perform the professional basketball services described in the 1984 Contract.

Earlier, in 1983, with respect to petitioner's professional basketball services for the Rockets during the 1983–84 basketball season, a written contract (1983 Contract) with the Rockets was entered into reflecting terms similar to the terms of the 1984 Contract. On the first page of the 1983 Contract, petitioner's PSC is named as the "Player" and as a party to the contract. On the signature line of the 1983 Contract, however, only petitioner's individual name appears as the "Player" and as a party to the contract. There is no indication on the signature line that petitioner was signing the 1983 Contract as an officer or representative of his PSC.

Most, if not all, of the specific terms and the specific language of the 1984 Contract with the Rockets implicitly speak in terms of petitioner *individually* as the "Player" governed by the contract. For example, only petitioner, individually, not his PSC, could possibly play "10 minutes per game" or be "one of the top three players in assists or steals".

Additionally, the Rockets did not rely on the contract with petitioner's PSC but required petitioner to sign a personal guarantee, thereby indicating the Rocket's reliance not on the 1984 Contract, but rather reliance on the personal guarantee and on petitioner individually for performance under the contract.

The majority opinion defers to the trial judge's finding that an oral contract existed between petitioner and his PSC. The mere existence of a contract, however, is in my opinion insufficient in and of itself to establish the bona fide nature of the contract. Petitioner must prove that the contract contained essential terms that establish the bona fide nature of the contract. Those terms, if they existed, are missing from the record in this case.

In summary, my suggested analysis in this case in favor of respondent is consistent with the decided cases in this area, and it is based on the cumulative effect of the following three points: (1) The record is inadequate to determine the substance and terms of any bona fide oral contract between petitioner and petitioner's PSC; (2) the 1984 Contract with the Rockets contained irregularities inconsistent with petitioner's position in this case that he had a bona fide contract with his PSC that controlled the performance of his basketball services for the Rockets; and (3) the Rockets required petitioner individually to provide a personal guarantee.

I emphasize that the contractual irregularities and deficiencies discussed and highlighted in this side opinion are not disputed. They are acknowledged in the majority opinion, and they should, in my opinion, control the outcome of this case. They lead to the conclusion that petitioner, not his PSC, is to be charged with the income received from the Rockets.

*Section 269A*

In 1982, Congress enacted section 269A, applicable to years beginning after December 31, 1982, in response to court decisions involving the relationship between the assignment of income doctrine and the use of closely held PSC's. Congress intended that section 269A overturn the decisions reached in cases like *Keller v. Commissioner,* 77 T.C. 1014 (1981), affd. 723 F.2d 58 (10th Cir. 1983), where an individual service provider owner of a PSC attempts to attribute income to the PSC that was in substance earned by the individual service provider. H. Conf. Rept. 97–760, at 633–634 (1982), 1982–2 C.B. 600, 679–680.

Generally, section 269A allows respondent to reallocate income from a PSC to a service-provider owner if substantially all of the services are performed for one other entity, and if the principal purpose for forming the PSC or the principal use of the PSC is to avoid or evade Federal income tax. It is significant that in enacting section 269A Congress did not inject into that remedial statute the employee-independent contractor analysis and factors that the majority utilizes in its analysis (i.e., the employee-versus-independent-contractor status of the individual service provider to the service recipient is simply not a factor).

The applicability and scope of section 269A has not yet been addressed in any published opinion. In this case, respondent, without adequate explanation, has conceded that the facts before us are not within the scope of section 269A. I suggest that in future similar situations respondent not shy away from utilizing the statutory provisions Congress has provided to address adjustments involving the assignment of income between PSC's and individual owners of the PSC's.

---

LARO, *J.*, dissenting: The majority clings tightly to the principles underlying the "team-sports doctrine" developed in *Sargent v. Commissioner,* 93 T.C. 572 (1989), revd. 929 F.2d 1252 (8th Cir. 1991).[1] With this adherence, I cannot agree and must respectfully dissent.

The judicially created team-sports doctrine is an unprecedented alternative test first applied in *Sargent v. Commissioner, supra.* This doctrine negated the first prong of the traditional two-prong control test which had evolved from the assignment of income rule enunciated in *Lucas v. Earl,* 281 U.S. 111, 115 (1930).[2] The majority claims a disavowal of the team-sports doctrine, but espouses a chameleonic "manner and means" test under which a team athlete will be precluded from incorporating his or her services. Although the majority acknowledges that "the mere use of the word 'team' to describe the organization that is the recipient of personal

---

[1] I use the term "team-sports doctrine" to refer to the rationale of *Sargent v. Commissioner,* 93 T.C. 572 (1989), revd. 929 F.2d 1252 (8th Cir. 1991), that effectively precludes a "team member" from incorporating his or her personal services. Although the majority opinion states that "Nowhere in *Sargent* did we state or imply that the mere description of the service recipient as a 'team' would be determinative", majority op. p. 153, the practical effect of this Court's majority opinion in *Sargent v. Commissioner, supra* is that the personal services furnished by a team-sports member to his or her personal service corporation will not be recognized for Federal income tax purposes.

[2] As stated in the majority opinion: "*Sargent* was the first case involving a personal service corporation in which * * * [the Court] applied the assignment of income doctrine by reference to the common law test for determining whether an employer-employee relationship existed between the service recipient and the individual service provider." Majority op. p 150; but see *infra* note 12. Although the majority opinion purports to reapply this common law test to the facts at bar, it does not explain the need to abandon the traditional analysis for assignment of income cases. By failing to do so, the majority opinion does not justify its need to depart from the traditional methodology. Moreover, the majority opinion fails to address adequately a critical part of the reasoning of the Court of Appeals in *Sargent v. Commissioner, supra,* finding error in the fact that this Court did not apply such a common law test to the "team member" in *Pflug v. Commissioner,* T.C. Memo. 1989–615. The majority opinion chooses to refute the Court of Appeals' reasoning concerning our inconsistent application in *Pflug v. Commissioner, supra,* in a brief footnote. See majority op. p. 154 note 14.

services is not determinative of employer status", majority op. p. 152, I am unable to envision a situation when a member of a "team" could incorporate his or her services under the majority's manner and means test.[3] The manner and means test is merely the *Sargent* team-sports doctrine reintroduced and redesigned under yet another name. I ask myself "What's in a name?" and I conclude "that which we call a rose By any other name would smell as sweet". Shakespeare, Romeo and Juliet, act II, sc. ii, 43.

The typical personal service corporation (PSC) scenario involves three players: A PSC, its shareholder/service provider, and a service recipient. As explained below, the focus of the traditional assignment of income methodology is on the relationships between the service provider and his or her PSC, on the one hand, and the PSC and the service recipient, on the other.[4] The team-sports doctrine changes this focus. The team-sports doctrine concentrates primarily on the relationship between the service provider and the service recipient. The manner and means test does likewise. Indeed, the manner and means test forces the Court to examine meticulously the relationship between a service recipient and service provider, and determine whether the service recipient "controls" the service provider notwithstanding a bona fide employment contract that was executed between the service

---

[3] The majority has also not listed such an example.

[4] The Congress responded to a perceived abuse in this area by enacting sec. 269A. Sec. 269A generally allows the Commissioner to allocate items between a PSC and its employee/shareholders in order to reflect clearly the income of the employee/shareholders or the PSC, if the "principal purpose" for the PSC is the avoidance or evasion of Federal income tax. Respondent did not determine or argue that sec. 269A applies to the instant case. In fact, she has disavowed its application by making the following stipulations:

22. The corporation, Allen Leavell, Inc., was formed for the primary purpose of creating flexibility for Allen Leavell to act as a free agent or claim the benefits of free agency in the event the Houston Rockets failed to release him from obligations imposed by the Uniform Player Contract.

23. Although certain tax benefits may have resulted from the incorporation of Allen Leavell, Inc. by Allen Leavell, *the corporation was not formed for the principal purpose of evading or avoiding federal income taxes* by securing the benefits of deductions, credits, or other allowances which would not otherwise be available.

24. Accordingly, based upon the facts of this case, the parties agree and Respondent concedes that no allocation of income, deductions, or credits is to be made under the specific authority of I.R.C. section 269A.

[Emphasis added.]

Given that respondent has, in effect, stipulated that the tool Congress has given to the Government to deal with perceived abuses by PSC's is not applicable and that the income in question is not to be reallocated under that section, the majority opinion's use of the "manner and means" test is nothing more than a solution in search of a problem.

provider and his or her PSC. In the case of a member of a team sport, such as petitioner, he or she will never meet the majority's manner and means test due to, for example: (1) The perceived control that a coach has over the team's members, (2) the need for team members to blend their talents and perform as a team in order to win, and (3) the inherent impossibility for each member of the team to schedule independently when, where, and how he or she will furnish his or her services to the team.

The Court developed the team-sports doctrine in *Sargent v. Commissioner, supra* at 580, based on the Court's belief that the nature of team sports "involves a high level of control over player activity by coaches and managers". *Id.* at 580. The majority opinion states that it is not applying this doctrine to the facts at hand. Instead, the majority pronounces, a service provider (and not his or her PSC) is the earner of income if the facts and circumstances show that "the service recipient has the right to control the manner and means by which the services are performed." Majority op. pp. 149, 154–155. In making its pronouncement, the majority appears to recognize that it is inappropriate to deny the right to incorporate to an individual merely because he or she is a member of a team. At the same time, however, the majority adopts a manner and means test that leads to the same result. The majority's attempt to dignify its result by utilizing this facts and circumstances test is not persuasive. The rules that apply to assignment of income cases involving a PSC and its sole shareholder/service provider have been firmly embedded in our jurisprudence throughout the last 65 years.

In Justice Oliver Wendell Holmes' seminal opinion in *Lucas v. Earl,* 281 U.S. 111 (1930), the Supreme Court enunciated the bedrock principle that income is taxed to him or her who earns it. Assignments of income, "however skillfully devised", cannot escape Federal income taxation by anticipatory arrangements. *Id.* at 115; see also *United States v. Basye,* 410 U.S. 441, 449–451 (1973); *Commissioner v. Culbertson,* 337 U.S. 733, 739–740 (1949). Pursuant to the Court's directive, courts continue to dissect skillfully devised arrangements to determine the true earner of income. The instant case, involving a professional basketball player and his wholly owned personal service corporation, requires this Court to do just that. In so doing, we must: (1) Consider Jus-

tice Holmes' opinion in *Lucas v. Earl, supra,* and its progeny, and (2) reconsider the core of our opinion in *Sargent v. Commissioner, supra.*

In *Lucas v. Earl, supra,* a husband and wife agreed to be joint tenants of all the property acquired by them during their marriage. The husband later earned salary and fees from personal service contracts to which his wife was not a party. The husband allocated 50 percent of this income to his wife pursuant to their agreement. Respondent disregarded their agreement and determined that the husband was taxable on 100 percent of his personal service income. *Id.* at 113–114. In upholding respondent's determination, the Supreme Court stated:

There is no doubt that * * * [a predecessor to section 61] could tax salaries to those who earned them and provide that the tax could not be escaped by anticipatory arrangements and contracts however skillfully devised to prevent the salary when paid from vesting even for a second in the man who earned it. That seems to us the import of the statute before us and we think that no distinction can be taken according to the motives leading to the arrangement by which the fruits are attributed to a different tree from that on which they grew. [*Lucas v. Earl, supra* at 114–115.]

This assignment of income doctrine, however, does not exist in a vacuum. The doctrine coexists with other, equally well-settled rules of tax law. For example, in *Moline Properties, Inc. v. Commissioner,* 319 U.S. 436, 438–439 (1943), the Supreme Court stated that a wholly owned corporation is a separate taxable entity that can operate only through its employees, and an individual can minimize his or her taxes through a corporate form of business. As long as the corporation is involved in a legitimate business activity, the Court stated, any tax advantages properly flowing from incorporation are free from attack by the Government.[5] As the Court stated:

The doctrine of corporate entity fills a useful purpose in business life. Whether the purpose be to gain an advantage under the law of the state of incorporation or to avoid or to comply with the demands of creditors or

---

[5] The Supreme Court observed, however, that there are recognized exceptions to treating a corporation as a separate taxable entity. For example, the Court stated: "the corporate form may be disregarded where it is a sham or unreal. In such situations the form is a bald and mischievous fiction." *Moline Properties, Inc. v. Commissioner,* 319 U.S. 436, 439 (1943). As documented by the facts at hand, the instant case is not one that warrants disregard for the corporate form.

to serve the creator's personal or undisclosed convenience, so long as that purpose is the equivalent of business activity or is followed by the carrying on of business by the corporation, the corporation remains a separate taxable entity. * * * [*Moline Properties, Inc. v. Commissioner, supra* at 438–439; fn. refs. omitted.]

With the tension between *Lucas v. Earl, supra,* and *Moline Properties, Inc. v. Commissioner, supra,* in mind, this Court pronounced: "The policy favoring the recognition of corporations as entities independent of their shareholders requires that we not ignore the corporate form so long as the corporation actually conducts business."[6] *Keller v. Commissioner,* 77 T.C. 1014, 1031 (1981), affd. 723 F.2d 58 (10th Cir. 1983). The majority disregards this pronouncement. Indeed, the taxpayer today is similar to the taxpayer in *Keller v. Commissioner, supra.* In *Keller v. Commissioner, supra,* respondent challenged a wholly owned professional corporation formed by a pathologist to hold his partnership interest in a medical partnership. Contemporaneously with forming this corporation, the pathologist agreed to render his services to the corporation in exchange for the corporation's paying him certain annual compensation. *Id.* at 1016–1017. Respondent argued then, as she similarly argues today, that the pathologist was taxable on 100 percent of the income received by the professional corporation under the doctrines of lack of business purpose and substance over form, and because the pathologist was the "true earner" of the income. Respondent argued that the pathologist's formation of the professional corporation accompanied by his execution of the employment contract constituted an anticipatory assignment of income to the corporation. *Id.* at 1030.

This Court rejected respondent's arguments. The Court recognized the existence of the pathologist's professional corporation and refused to reallocate the income from the corporation to the service-provider/pathologist under the assignment of income doctrine. The Court observed that an employer/employee relationship existed in the case, stating that "We find that an employment relationship was created in this case by the employment agreement and that it was

---

[6] In the instant case, respondent is asking the Court to ignore corporation to the extent that it marketed petitioner's professional basketball services.

maintained by the parties to the agreement after the execution".[7] *Id.* at 1032.

Our approach in *Keller v. Commissioner, supra* with respect to the assignment of income issue was followed in *Haag v. Commissioner,* 88 T.C. 604, 610–614 (1987), affd. without published opinion 855 F.2d 855 (8th Cir. 1988); *Bagley v. Commissioner,* 85 T.C. 663, 674–676 (1985), affd. 806 F.2d 169 (8th Cir. 1986); *Johnson v. Commissioner,* 78 T.C. 882, 889–892 (1982), affd. without published opinion 734 F.2d 20 (9th Cir. 1984); *Pacella v. Commissioner,* 78 T.C. 604, 622 (1982); and *Pflug v. Commissioner,* T.C. Memo. 1989–615. In each of these cases, the Court held that income was not reallocable from a PSC to the service-provider under the assignment of income doctrine if the service-provider met both prongs of a two-prong control test evolving from case law beginning with *Lucas v. Earl,* 281 U.S. at 115.[8] *Johnson v. Commissioner, supra* at 891; see also sec. 31.3121(d)–1(c)(2), Employment Tax Regs. Under this two-prong test, a

[7] The Congress responded to the fact pattern of *Keller v. Commissioner,* 77 T.C. 1014, 1031 (1981), affd. 723 F.2d 58 (10th Cir. 1983), by enacting sec. 269A, applicable to taxable years beginning after Dec. 31, 1982. See *supra* note 4. According to the legislative history, "The conferees intend that the provisions * * * [of sec. 269A] overturn the results reached in cases like *Keller v. Commissioner,* 77 T.C. 1014 (1981), where the corporation served no meaningful business purpose other than to secure tax benefits which would not otherwise be available." H. Rept. 97–760, at 633–634 (1982), 1982–2 C.B. 600, 679–680. Because respondent conceded that no allocation is to be made under sec. 269A, the Court should apply the analysis that we applied in *Keller v. Commissioner, supra* and reach a result that is consistent thereto. The majority, however, does not. It develops a new analysis to apply to the fact pattern of *Keller v. Commissioner, supra,* and reaches a result that is contrary to our opinion there. In so doing, the majority has obviated the need for respondent to utilize the precise tool that the Congress gave her to deal with fact patterns similar to *Keller v. Commissioner, supra,* such as the facts at hand.

[8] While recognizing that the assignment of income doctrine may apply in the corporate context, the Court has observed that this control test is better than the true earner test articulated in *Lucas v. Earl,* 281 U.S. 111, 115 (1930), because a corporation is an inanimate person that can earn service income only through the performance of its employees and agents. See, e.g., *Bagley v. Commissioner,* 85 T.C. 663, 675 (1985), affd. 806 F.2d 169 (8th Cir. 1986); *Haag v. Commissioner,* 88 T.C. 604, 610–611 (1987), affd. without published opinion 855 F.2d 855 (8th Cir. 1988); see also *Vercio v. Commissioner,* 73 T.C. 1246, 1254–1255 (1980). The control test generally asks the question: "Who controls the earning of the income, the individual or his or her corporation?" *Johnson v. Commissioner,* 78 T.C. 882, 891 (1982), affd. without published opinion 734 F.2d 20 (9th Cir. 1984); *Bagley v. Commissioner, supra* at 675. The majority does not ask or answer this question. By failing to do so, the majority ignores the importance of the following precedent in *Schneer v. Commissioner,* 97 T.C. 643, 659–660 (1991) (quoting *Johnson v. Commissioner, supra* at 890):

"Recognition must be given to corporations as taxable entities which, to a great extent, rely upon the personal services of their employees to produce corporate income. When a corporate employee performs labors which give rise to income, it solves little merely to identify the actual laborer." * * * ⁴ an employee of a personal service corporation * * * is outside the holding of *Lucas v. Earl, supra,* to some degree because of the "entity concept." The business entity is cast as the earner of the income, obviating the need to analyze whether there has been an assignment of income.

PSC controls the service-provider, and, hence, earns the income, if: (1) The service-provider is an employee of the PSC, and the PSC has the right to direct and control him or her in a meaningful sense,[9] see, e.g., *Vnuk v. Commissioner,* 621 F.2d 1318, 1320–1321 (8th Cir. 1980), affg. T.C. Memo. 1979–164; *Bagley v. Commissioner, supra* at 675–676; and (2) the PSC and the service-recipient have a contract or similar indicium recognizing the controlling position of the PSC, see, e.g., *Pacella v. Commissioner, supra* at 622; see also *Haag v. Commissioner, supra* at 612–614 (second prong met despite absence of written or formal contract between PSC and service-recipient; employment agreement existed between PSC and service-provider, and the service-recipient recognized the PSC as the entity through which the service-provider performed his services); *Johnson v. Commissioner, supra* at 893 (PSC was not the controller of the service-provider; as stated by the Court: "Crucial is the fact that there was no contract or agreement between the * * * [service-recipient] and * * * [the PSC]"). In connection with this two-prong test, Professors Bittker and Eustice have stated that

Although the contours of this bifurcated control over the income test remain to be developed by the courts, a contract between a personal service corporation and its shareholder-employee should ordinarily be effective unless it (1) fails to supersede a prior contract between the shareholder-employee and the customers to whom the services are rendered, (2) is disregarded in practice, or (3) is ineffective under local law because the corporation cannot legally practice in the area. [Bittker & Eustice, Federal Income Taxation of Corporations and Shareholders, par. 2.07[2], at 2–26 (5th ed. 1987); fn. ref. omitted.]

As she did in *Sargent v. Commissioner,* 93 T.C. 572 (1989), revd. 929 F.2d 1252 (8th Cir. 1991), respondent urges us to reject this two-prong test and apply the team-sports doctrine that she advocated in *Sargent.*[10] Currently viewing this issue in the light of a different record, and with the benefit of the

---

[9] The right to control an employee is usually evidenced by an employment contract between the PSC and the service-provider. See, e.g., *Haag v. Commissioner, supra* at 612 (employment agreement gave the PSC control over the service-provider's medical practice although the service-provider could unilaterally rescind, modify, or ignore the agreement), affd. without published opinion 855 F.2d 855 (8th Cir. 1988). As observed by the Court of Appeals for the Eighth Circuit, there exists "ample Tax Court precedent which upholds the sanctity of contractual relations between taxpayers and their respective personal service corporations." *Sargent v. Commissioner,* 929 F.2d 1252, 1258 (8th Cir. 1991), revg. 93 T.C. 572 (1989).

[10] Respondent had announced the team-sports doctrine as her litigating position in G.C.M. 39553 (Sept. 3, 1986).

opinion of the Court of Appeals for the Eighth Circuit, we should decline respondent's invitation to abandon the traditional assignment of income analysis. Instead, we should decide the *Sargent v. Commissioner, supra,* issue according to the traditional analysis, generally developed by the Supreme Court and this Court, and the contract theory enunciated by the Court of Appeals for the Eighth Circuit in *Sargent v. Commissioner,* 929 F.2d 1252 (8th Cir. 1991). We should not depart from this analysis because: (1) *Lucas v. Earl, supra,* and its progeny, provides a solid framework on which to decide the issue herein, (2) contrary tests, such as the team-sports doctrine and the manner and means test, are not adequate barometers for resolving a claim of an assignment of income because they disregard any valid contractual relationship existing between the employer and employee, and (3) it is inconsistent to apply a contrary method to an athlete merely because he or she is a member of a judicially defined team.

In *Sargent v. Commissioner, supra,* each taxpayer was a professional hockey player who formed a wholly owned PSC to negotiate with his professional hockey team, the club.[11] Each taxpayer entered into an employment agreement with his PSC whereby the taxpayer agreed that he would exclusively perform services for the PSC as a professional hockey player and consultant. On the same day, each PSC entered into an agreement with the club whereby the PSC primarily agreed to furnish to the club the services of its employee/taxpayer as a hockey player and consultant; in return, the club agreed to pay the PSC specified remuneration. Each taxpayer, his PSC, and the club also entered into an agreement whereby: (1) The PSC represented to the club that the PSC had the

---

[11] Prior to the Tax Reform Act of 1986 (TRA), Pub. L. 99–514, 100 Stat. 2085, the Code provided numerous incentives for a professional to incorporate his or her services. For example, a service-provider could take modest salaries from his PSC and, in effect, divert income from his or her personal services to his or her PSC; before the TRA, the maximum marginal rate of tax for corporations was lower than the maximum marginal rate of tax for individuals. Similarly, the individual could adopt a fiscal year for the PSC which ended on the last day of the first month of his or her individual taxable year. With proper tax planning, the individual could then defer the recognition of the personal service income earned in one year until the next year by drawing the majority of his or her salary in the first month after the end of his or her taxable year. The TRA minimized many of these incentives. See, e.g., secs. 1, 11 (maximum corporate rate of tax higher than maximum individual rate of tax); sec. 441(i) (taxable year of a PSC generally must be the calendar year); see also sec. 11(b)(2) (certain PSC's are taxed at a flat rate of 35 percent, rather than at the graduated rates of tax in sec. 11(a) that are otherwise applicable to corporations); *supra* note 6.

right to cause its employee to perform services on its behalf, and (2) the PSC would cause the employee to perform the agreed-upon services to the club in order to fulfill the PSC's obligations under the agreement.[12]

Following the execution of these agreements, each taxpayer played hockey for the club pursuant to his exclusive agreement with his PSC, and the club remitted payments for each taxpayer's services directly to his PSC. Each PSC, in turn, paid a portion of the payments to the taxpayer and contributed another portion of the payments to the PSC's pension plan. Each PSC withheld Federal income taxes and withheld and paid employment taxes in connection with the payments that it made to its employee/taxpayer. *Sargent v. Commissioner*, 93 T.C. at 573–577.

The Court held that each taxpayer was taxable on the entire amount paid to his PSC by the club. In so holding, the Court stated that the facts presented "a classic situation for the application of the assignment of income doctrine articulated in *Lucas v. Earl,* 281 U.S. 111 (1930), and its progeny," and turned aside our traditional analysis for deciding assignment of income cases, reasoning that "the nature of team sports is a critical element which must be taken into account in determining the existence of an employer/employee relationship in accordance with common law principles".[13] *Sargent v. Commissioner,* 93 T.C. at 579–581, 583. Based on this "critical element", the Court proceeded to hold that each taxpayer was controlled by his team, the club, rather than his PSC. The Court held that each taxpayer was an employee of the club, rather than his PSC, and was taxable on the amounts paid by the club to his PSC for his services. *Id.* at 583.

---

[12] As is true in the case at hand, each taxpayer also personally guaranteed his PSC's obligations to the service-recipient. *Sargent v. Commissioner,* 93 T.C. 572 (1989). The Court in *Sargent v. Commissioner, supra,* found no relevance in this personal guarantee. The majority does. In my mind, the majority places too much emphasis on this fact. The personal guarantee of a 100-percent shareholder is commonly required in the business world. In this regard, the majority does not indicate how their analysis would apply to this everyday occurrence.

[13] In abandoning our traditional analysis, the Court stated that the Court had never addressed whether an employer/employee relationship existed in any of our prior assignment of income opinions. *Sargent v. Commissioner,* 93 T.C. at 582. As subsequently noted by the Court of Appeals for the Eighth Circuit, however, "Each time the legitimacy of the employee's relationship with the ᵗ * * [PSC] was raised [in our prior assignment of income cases], the Tax Court pointed to the existence of a contractual relationship between the * * * [PSC] and the employee/service-provider as the rationale for upholding the legal significance of the PSC." *Sargent v. Commissioner,* 929 F.2d at 1258.

The Court of Appeals for the Eighth Circuit disagreed. The appellate court firmly rejected the team-sports doctrine and focused on the contractual relationship between each taxpayer and his PSC. *Sargent v. Commissioner,* 929 F.2d at 1258. In holding that the amounts were taxable to the PSC's, the appellate court determined that section 31.3121(d)–1(c)(2), Employment Tax Regs., and this Court's prior opinions, directed that the PSC's (and not the club) were the employers of the taxpayers because both prongs of the two-prong test were met; namely:

(1) Each taxpayer was an employee of his PSC whom the PSC had the right to direct or control in some meaningful way; and

(2) a contract or similar indicium recognizing the PSC's controlling position existed between each PSC and the club.

Respondent contends that the Court of Appeals for the Eighth Circuit erroneously reversed our decision in *Sargent v. Commissioner, supra.* Respondent argues in her brief that "the Eighth Circuit employed a superficial form over substance analysis relying on the *mere existence* of the taxpayers' contracts with their respective * * * [PSC's], rather than the control imposed directly on the taxpayers by the team's coaching staff and management." (Emphasis added.) The majority agrees. Majority op. p. 154. Both are mistaken. The PSC's right to control its employee/taxpayer in *Sargent v. Commissioner, supra,* was evidenced by more than the "mere existence" of the employment contract. The contractual relationships at issue there met the two-prong control test mentioned above.[14] The majority's holding to the contrary fails to appreciate the well-settled principle that a wholly owned corporation is an entity separate and apart from its shareholder.

---

[14] I do not mean to suggest that the "mere existence" of an employment contract may or may not be enough to satisfy the two-prong control test. The Court need not resolve that issue today. The record in *Sargent v. Commissioner, supra,* as well as the record at bar, evidences an employer/employee relationship between the PSC and the service-provider through more than an employment contract. With respect to *Sargent v. Commissioner,* 93 T.C. at 573–577, I note: (1) Following the receipt of legal advice, each taxpayer formed his PSC for a legitimate business purpose that involved "selling" his services to the club as an employee of the PSC, (2) the club entered into an agreement whereby each PSC represented to the club that the PSC had the right to cause its employee to perform services on its behalf, (3) the club remitted payments for each taxpayer's services directly to their PSC's, (4) each PSC withheld Federal income taxes, and withheld and paid employment taxes, in connection with the payment of service income to the taxpayers, (5) the PSC's filed the necessary employer/employee payroll tax returns with the Commissioner, and (6) the club recognized and respected the employment contracts between each taxpayer and his PSC.

See, e.g., *Moline Properties, Inc. v. Commissioner,* 319 U.S. 436 (1943). The majority's disregard for this well-settled principle is clearly seen from its following statement: "we believe that Judge Arnold's dissent in *Sargent* captured the essence of that case when he wrote: 'The idea that the coach issued orders to Sargent and Christoff in their capacity as corporate officers, which orders they then relayed to themselves as corporate employees, is fanciful.'" Majority op. p. 155. As a point of fact, this "fanciful" scenario is present (and, with the exception of today, respected) in *any* solely owned corporation setting where the sole shareholder is also an officer and employee of the corporation. The fact that an individual shareholder may serve simultaneously in the role of officer and employee of his or her wholly owned corporation is indisputable and flows naturally from the fact that he or she may form such a corporation.

The majority states that "the most important factor" for deciding the issue at hand is the "right to control the manner and means by which the individual service provider renders the services for which compensation is being paid." Majority op. p. 155. I disagree. The fact that the majority is mistaken is seen from our opinions outside of *Sargent v. Commissioner, supra.* For example, the facts of the instant case are similar to the facts of *Johnson v. Commissioner,* 78 T.C. 882 (1982), affd. without published opinion 734 F.2d 20 (9th Cir. 1984). In *Johnson* the taxpayer (Johnson) was a basketball player with the San Francisco Warriors (Warriors) of the National Basketball Association (NBA). In 1974, Johnson signed a contract with an unrelated corporation (PMSA) that: (1) Gave PMSA the right to Johnson's services in professional sports for 6 years starting on August 16, 1974, (2) gave PMSA the right to control Johnson's services in professional sports, and (3) obligated PMSA to pay Johnson $1,500 a month. Johnson also signed a Uniform Player Contract with the Warriors that obligated him to play basketball for the Warriors for the 1974–75 and 1975–76 basketball seasons. *Id.* at 884. In the following year, 1975, Johnson assigned his rights under the 1974 Uniform Player Contract to a second unrelated corporation (EST). The Warriors remitted the contract payments for Johnson's services directly to EST following that assignment. In deciding the assignment of income issue there, the Court did not discuss the majority's means and methods test. The

Court simply applied the two-prong test. With respect to the first prong, the Court looked solely to the contracts to determine whether it was met:

we accept arguendo that the * * * [PMSA-Johnson] agreement was a valid contract which required the payments with respect to * * * [Johnson's] performance as a basketball player ultimately to be made to PMSA or EST. * * * We also accept arguendo that the * * * [PMSA-Johnson] agreement gave PMSA a right of control over * * * [Johnson's] services * * *. Thus, the first element is satisfied. * * * [*Johnson v. Commissioner, supra* at 891–892.[15]]

Likewise, in *Pflug v. Commissioner,* T.C. Memo. 1989–615, a case involving a taxpayer/actress, the Court passed on whether the taxpayer was an employee of a PSC or an independent contractor.[16] As we had done in *Johnson v. Commissioner, supra,* the Court looked exclusively to the two-prong control test and concluded that the taxpayer was the PSC's employee. The Court relied solely on the contract between the taxpayer and the PSC and held that the PSC had the right to control the taxpayer by virtue of its employment contract with her. As later observed by the Court of Appeals for the Eighth Circuit in *Sargent v. Commissioner,* 929 F.2d at 1257:

This Court is perplexed to find that those same contractual arrangements which were dispositive of the issue of "control" in *Pflug* were summarily discarded in the case before us. By the same token, those same "team" factors which were dispositive of the issue of control in the case before us were not even discussed in *Pflug.*

Was not Joanne Pflug a part of a team every bit as "controlled" as Sargent and Christoff? Like a hockey team in which different players assume different roles to insure success, the members of Pflug's team included the cast, writers, directors, and producers all working toward the common goal

---

[15] The Court ultimately held against Johnson because the Warriors did not have an agreement with either PMSA or EST that addressed the taxpayer's basketball services. Accord *Johnson v. United States,* 698 F.2d 372 (9th Cir. 1982). In the instant case, by contrast, petitioner's basketball services were discussed in both his contract with corporation and the Rockets' contract with corporation.

[16] In *Pflug v. Commissioner,* T.C. Memo. 1989–615, the taxpayer contracted with her husband's wholly owned PSC to perform her acting services exclusively as its employee. Subsequently, the taxpayer and her husband separated, and, in June 1982, the taxpayer severed her relationship with the PSC. From 1975 until June 1982, all contracts for the taxpayer's acting services were executed between the PSC, as the taxpayer's employer, and the service-recipients (producers). The producers paid the PSC all amounts for the taxpayer's services and did not pay or withhold any employment taxes with regard to these amounts; the PSC, in turn, paid a salary to the taxpayer and paid employment taxes with respect to the salary. The PSC included on its Federal income tax returns the amounts paid to it by the producers and deducted its payments to the taxpayer as wage expense.

of producing a successful TV series. More importantly, just as a hockey player has a generalized set of plays tailored to fit his talents and the talents of his teammates, so, too, Ms. Pflug's "plays" included movements carefully choreographed to mesh with other cast members, a script prepared for her to follow, cue cards to insure that little or no deviation from the designed "play" occurred, and numerous retakes to guarantee that ultimate control vested in the hands of the studio, not Ms. Pflug's PSC. Nevertheless, the Tax Court concluded that Ms. Pflug was an employee of her PSC.

There can be little question that Ms. Pflug was part of a team under more stringent production controls than those placed on either Sargent or Christoff by the Club. But, as the Tax Court concluded, " * * * by virtue of the contract [Pflug] entered with Charwool [the PSC], Charwool had the requisite right to control [Pflug]." * * * Appellants' contractual arrangements, which were every bit as bona fide as those entered into by Ms. Pflug, should and do provide the requisite control for Appellants to be considered employees of their respective PSCs. [Fn. ref. and citation omitted.]

Accordingly, reverting to the traditional approach and applying the two-prong control test to the case at hand, I would hold that both prongs were met. With regard to the first prong, petitioner was corporation's employee, and corporation had the right to (and in fact did) control him in a meaningful sense. Corporation was a valid corporation formed under the laws of Texas for legitimate business purposes; i.e., to serve as petitioner's employer for his basketball services, personal appearances, and endorsement opportunities.[17] Corporation also continuously operated in a business-like manner, e.g., corporation followed corporate formalities, had its own checking account, filed tax returns, incurred liabilities, had a payroll, and entered into contracts. Although petitioner may have formed corporation, in part, with an eye towards minimizing taxation, "one may so arrange his affairs that his taxes shall be as low as possible; he is not bound to choose that pattern which will best pay the Treasury; there is not even a patriotic duty to increase one's taxes." *Helvering v. Gregory,* 69 F.2d 809, 810 (2d Cir. 1934), affd. 293 U.S. 465 (1934).

---

[17] Respondent has not disputed corporation's viability to the extent that corporation was petitioner's employer for purposes other than to market his basketball services. In this regard, the record does not indicate that corporation controlled petitioner's personal services with regard to his basketball services in any less of a significant manner than it controlled his personal services with regard to his personal appearances and endorsements. Concluding that corporation is not a viable entity with respect to petitioner's basketball services, but not with respect to his personal appearances and endorsements, is a distinction without a difference and is arbitrary.

With regard to petitioner's relationship with corporation, petitioner was corporation's employee. Petitioner agreed to provide his exclusive basketball services to third parties in his capacity as an employee of corporation, and corporation had the right to "sell" petitioner's services to any team during the time period specified in the 1984 Uniform Player Contract. Corporation also had the right to designate the professional basketball team for which petitioner would play basketball and had the right to dictate the time and place of petitioner's personal appearances and endorsement opportunities. Although petitioner did not introduce into evidence a written employment contract between himself and corporation, I, as the trier of fact, found the trial witness' testimony on the existence of such an employment agreement to be credible and undisputed by respondent. The following facts also exemplify the existence of an employment agreement between corporation and petitioner: (1) Corporation was specifically formed to serve as petitioner's employer for his basketball services, personal appearances, and endorsement opportunities; (2) Mr. Luchnick negotiated the 1984 Uniformed Player Contract, and did so in his capacity as one of corporation's officers; (3) Mr. Patterson signed the 1984 Uniform Player Contract on behalf of the Rockets, and did so with the understanding that the Rockets were obtaining petitioner's basketball services in his capacity as an employee of corporation; (4) the Rockets dealt with corporation and respected both its corporate form and its employer/employee relationship with petitioner; (5) corporation issued petitioner a 1985 Form W-2 to inform him that it had paid him wages during the 1985 calendar year (corporation would have issued petitioner a 1985 Form 1099–MISC if corporation had wanted to inform petitioner that it had paid him nonemployee compensation during that year); and (6) petitioner reported his compensation from corporation as wage income.

That petitioner was an employee of corporation is further seen from the NBA and the Rockets' recognition of corporation as petitioner's employer. The record is barren of any suggestion or implication that petitioner, corporation, or the Rockets ignored the employment agreement under which corporation employed petitioner. When a taxpayer, such as petitioner, has exercised considerable bargaining power in arm's-

length negotiations over the manner in which he or she will provide his or her services to a recipient, the Court should weigh heavily the parties' belief in the type of employment relationship that they created. *Penn v. Howe-Baker Engrs., Inc.,* 898 F.2d 1096, 1103 n.9 (5th Cir. 1990) (parties' intent is a "significant factor" when weighing the common law factors that distinguish an employee from an independent contractor).[18] The majority has not done so.[19]

In connection with the second prong of the two-part test, the PSC (corporation) and the service-recipient (Rockets) had a contract or similar indicium recognizing the controlling position of corporation. The 1984 Uniform Player Contract evidenced the relationship between corporation and the Rockets and was reached following arm's-length negotiations between Mr. Patterson and Mr. Luchnick. In negotiating the 1984 Uniform Player Contract, Mr. Patterson was acting as an officer of the Rockets, and Mr. Luchnick was acting as an officer of corporation. By virtue of the 1984 Uniform Player Contract, the Rockets recognized and appreciated that petitioner was an employee of corporation, and respected the employer/employee relationship existing between corporation and petitioner. The Rockets also issued corporation a 1985 Form 1099–MISC, reporting the amount of compensation that the Rockets paid to corporation during the 1985 calendar year, and did not pay or withhold payroll or income taxes on this compensation. Corporation, in turn, issued petitioner a 1985 Form W–2 reporting the amount of compensation that it had paid to him during that calendar year.

In conclusion, I would hold that the $204,333 is not includable in petitioner's gross income because both prongs of the two-prong control test were met. Because the majority chooses to reach a contrary result by adopting and applying

---

[18] The majority holds that petitioner is a "professional" as that term is used in *Professional & Executive Leasing Co. v. Commissioner,* 862 F.2d 751 (9th Cir. 1988), affg. 89 T.C. 225 (1987). The majority, therefore, concludes that petitioner is subject to a lower standard in determining whether he should be considered an employee of the Rockets. Notwithstanding my disagreement with the majority's test in the first place, I believe that the majority has misapplied the term "professional" as it was used in *Professional & Executive Leasing Co. v. Commissioner, supra.* The term "professional" as used in *Professional & Executive Leasing Co.* applied to individuals who were engaged in a licensed profession, such as doctors and attorneys. In our case, petitioner is a basketball player who is called a professional in order to distinguish him from an amateur.

[19] With respect to petitioner's arrangement as an employee of corporation, the legitimacy of such an arrangement in the taxable year in issue is also discerned from the fact that the NBA prohibited corporate employers of NBA players after that year. Such a prohibition by the NBA would have been unnecessary had the NBA considered these corporate employers to be shams.

a result-oriented manner and means test, I respectfully dissent.

HAMBLEN, JACOBS, and WELLS, *JJ.,* agree with this dissent.